```
 1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    WESTERN DIVISION - LOS ANGELES

 3

 4   UNITED STATES OF AMERICA,  )   Case No. CV 23-8153-MCS (KSx)
                                )
 5        Plaintiff,            )   Los Angeles, California
                                )   Thursday, December 7, 2023
 6             v.               )   11:10 A.M. to 12:06 P.M.
                                )
 7   BRYANT RIVERA,             )
                                )
 8        Defendant.            )
     _____)
 9

10

11

12                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE KAREN L. STEVENSON
13              UNITED STATES MAGISTRATE JUDGE

14

15   Appearances:              See Page 2

16   Deputy Clerk:             Gay Roberson

17   Court Reporter:           Recorded; CourtSmart

18   Transcription Service:    JAMS Certified Transcription
                                16000 Ventura Boulevard #1010
19                              Encino, California  91436
                                (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

1    APPEARANCES:

2

3    For the Plaintiff:          United States Attorney's Office
                                  Central District of California
4                                Criminal Division
                                  By:   JOHN J. LULEJIAN
5                                312 North Spring Street, 12th Floor
                                  Los Angeles, California  90012
6                                (213) 894-0721
                                  john.lulejian@usdoj.gov
7

8    For the Defendant:          Federal Public Defender
                                  Central District of California
9                                By:  J. ALEJANDRO BARRIENTOS
                                  321 East Second Street
10                               Los Angeles, California  90012-4206
                                  (213) 894-2854
11                               alejandro_barrientos@fd.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  LOS ANGELES, CALIFORNIA, THURSDAY, DECEMBER 7, 2023, 11:10 A.M.

2      (Call to Order of the Court.)

3          THE CLERK:  Calling Case No. CV 23-8153,

4  *United States of America v. Bryant Rivera*.

5          Counsel, please state your appearances for the

6  record.

7          JOHN J. LULEJIAN:  Good morning, Your Honor.

8  John Lulejian for the United States of America.

9          THE COURT:  Good morning, Mr. Lulejian.

10         J. ALEJANDRO BARRIENTOS:  And good morning,

11  Your Honor.  Alejandro Barrientos for Mr. Bryant Rivera,

12  who's present.

13         THE COURT:  Good morning, Mr. Barrientos.

14         And good morning to you, Mr. Rivera.

15         BRYANT RIVERA:  Good morning.

16         THE COURT:  This is the time the Court had set to

17  hear the defendant's motion for certain discovery in this

18  matter, and the defendant, Mr. Barrientos, has also filed a

19  request that the Court extend the briefing schedule on the

20  pending -- underlying extradition -- motion for extradition

21  depending upon the outcome of this particular hearing while

22  this motion is pending.

23         So I've read the parties' papers, and I am happy to

24  hear oral argument.  This is an important motion.

25         And, Mr. Lulejian -- well, no.

1          Mr. Barrientos, it's your motion.  So please

2   address the Court first from the lectern.  And I have some

3   questions for you, but we'll get to them as you complete your

4   argument.

5          MR. BARRIENTOS:  Thank you, Your Honor.

6          There was quite a bit of briefing.  So I don't want

7   to kind of beat to death all of the legal arguments, but I

8   think the bottom line, from our perspective, is that the

9   Government cited cases -- while they -- the Government does

10  cite a lot of cases, it is a lot of smoke and mirrors.  There

11  are cases that do not address the constitutional arguments

12  that Mr. Rivera has asserted, there are cases that do not

13  address similar types of discovery requests as those made by

14  Mr. Rivera, and in particular, a number of the cases address

15  requests by relators in extradition proceedings to get

16  information from the country that is requesting the

17  extradition, which is not something that Mr. Rivera is doing

18  here.

19          THE COURT:  Okay.  But let me stop you, then, so we

20  can -- I appreciate that because we can focus very precisely

21  what the Court's concerns are.

22          One of my concerns is the case that defendant cites

23  from the Sixth Circuit.  I find very little, if any, case law

24  here in the Ninth Circuit that particularly follows that case

25  and also the fact that subsequent history with respect to

1   that case narrows the nature of the discovery that was

2   provided significantly.

3           And concomitant with that, I want you to address

4   the significant -- most significant Ninth Circuit case on the

5   issue, which would be the *Oen Yin-Choy* from 1988, which at

6   page, I believe, 1407 specifically indicates that -- you

7   know, certainly while there is no statutorily procedural

8   obligation to preside -- provide such discovery and the court

9   retains its discretion to order discovery in extradition

10  proceedings and has its inherent power to do so, in

11  exercising its discretion to grant or deny discovery, an

12  extradition court should consider that, quote, "extradition

13  proceedings are not to be converted into a dress rehearsal

14  for trial," close quote, and, quote, "whether the resolution

15  of the contested issue would be appreciably advanced by the

16  requested discovery," close quote.

17          So the Court has primary concern that the

18  Ninth Circuit has not followed, necessarily, the

19  Sixth Circuit decision that the defendant relies heavily on,

20  and even in the *Oen Yin-Choy*, where the Ninth Circuit has

21  recognized the inherent authority of the court to order some

22  discovery, it is not the full-scale type of discovery that is

23  requested here of everything that the United States

24  Government may have provided to help identify -- help the

25  Mexican Government identify and that this is indeed a civil

1    proceeding.  Most of the Ninth Circuit cases cited by the

2    Government indicate that there are not the same due process

3    concerns for protections at issue in this type of discovery

4    -- in assessing this type of discovery request because we are

5    not adjudicating guilt or innocence here in the extradition

6    context.

7         So I just want to be as clear and transparent with

8    my thinking and what my concerns are in approaching the

9    motion if that helps you in focusing your argument.

10        MR. BARRIENTOS:  Yes, Your Honor.  Thank you.  I

11   certainly appreciate that.

12        As to the decisions coming from the Ninth Circuit

13   in particular, I do recognize that there's not any case that

14   says, "We are adopting *Demjanjuk*," the Sixth Circuit opinion,

15   but there is also a dearth of case law in the Ninth Circuit,

16   and in particular, if we look at the *Oen Yin-Choy* matter,

17   from my reading of it, it did not look like there was any

18   constitutional analysis at all.  So I don't know that it

19   addressed any of the arguments that Mr. Rivera is making in

20   this particular case.

21        THE COURT:  Well, but it does specifically say Oen

22   was not denied due process by the extradition court's refusal

23   to allow him to cross-examine.  So it does not explicitly

24   say, "We are talking about his constitutional rights," but to

25   the extent that they actually cite that there was no denial

1    of due process in connection with the discovery requests

2    there, that is inherently a constitutional analysis.

3            MR. BARRIENTOS:  Well, a couple of responses to

4    that.  I think one point is that *Oen Yin-Choy* had very little

5    case-specific explanation; so it's not entirely clear what

6    the Ninth Circuit was saying did not violate due process.  It

7    could have been that the relator in that matter was looking

8    for discovery from the requesting country.  I don't think we

9    know based on the description of the matter in that case.

10           Another point that I would raise is that

11   *Oen Yin-Choy* didn't do a -- did not go through the *Mathews v.*

12   *Eldridge* process for addressing due process claims.  So I

13   don't know -- you know, the extent of the briefing in that

14   case -- I don't know if the relator in that case said, "Here

15   are the constitutional interests that are at stake, here is

16   the countervailing Government interests, and here is why

17   discovery will further an accurate determination of the

18   matter at hand," but the Court can't -- there's nothing to go

19   on.

20           And the bottom line here is that *Mathews v.*

21   *Eldridge* is the mechanism for determining due process claims.

22   There has never been -- I don't think I've ever seen any case

23   that saying there's any kind of carve-out for any particular

24   type of case.  The Court's seen all the briefing; so you know

25   there's cases about the no-fly list, there's cases about

1  enemy combatants, there's --

2          THE COURT:  But those folks are all being -- their

3  criminal liability, if any, guilt or innocence, in those --

4  the no-fly list, the enemy combatants -- those cases involve

5  individuals whose criminal culpability, as it were, is being

6  adjudicated here in the United States under U.S. law.  Those

7  --

8          MR. BARRIENTOS:  Well, I'd push back a little bit

9  on that, Your Honor.  I don't think in those cases that there

10 were criminal charges that were being adjudicated.

11         THE COURT:  Well, particularly as to the no-fly

12 list, but enemy combatants is different.

13         MR. BARRIENTOS:  Okay.

14         So the bottom line, though -- and also, if you look

15 at the cases involving aliens who are going through

16 deportation proceedings, that is also not a criminal matter,

17 but nonetheless the Ninth Circuit has said we look at these

18 factors, and we look at the interests that are at stake for

19 the parties and how discovery will -- or other procedural

20 mechanisms might ensure that we get a fair and accurate

21 outcome, and in all these situations, the Ninth Circuit has

22 said, "Yes, discovery is appropriate."  There might be

23 different levels of discovery depending on the circumstances,

24 and I'm happy to talk about specifics when the Court's ready

25 to address that --

| | |
|---|---|
| 1 | THE COURT:  Let me ask you one other question, |
| 2 | then.  How do you square that argument with the fact that |
| 3 | Federal Rule of Criminal Procedure 1(a)(5)(A) explicitly |
| 4 | excludes from the governance of those rules the extradition |
| 5 | and rendition of a fugitive? |
| 6 | MR. BARRIENTOS:  Your Honor, I don't think that's a |
| 7 | particularly difficult issue.  All it says is that the |
| 8 | Federal Rules do not apply, and we are not invoking any |
| 9 | federal rule for discovery.  So I think it is just |
| 10 | irrelevant. |
| 11 | THE COURT:  Okay. |
| 12 | MR. BARRIENTOS:  And I acknowledge the |
| 13 | Federal Rules of Criminal Procedure do not compel discovery |
| 14 | in this case, and that is why I'm citing *Mathews* and all of |
| 15 | its -- |
| 16 | THE COURT:  Relying on a due process analysis -- |
| 17 | rubric? |
| 18 | MR. BARRIENTOS:  That's correct, Your Honor. |
| 19 | THE COURT:  Okay. |
| 20 | I'm sorry.  Go ahead.  Continue. |
| 21 | MR. BARRIENTOS:  So, Your Honor, what I was saying |
| 22 | was that if you look at all these Ninth Circuit cases -- and |
| 23 | I think this, really, is correct -- they either -- there |
| 24 | might be some passing mention of due process in *Oen Yin-Choy*, |
| 25 | but in large part they're not really addressing the arguments |

1    that are made here, and they either address discovery

2    requests not by -- made by Mr. Rivera or their descriptions

3    of what was being requested are so vague that they're not

4    helpful to the Court in resolving this matter.

5           I pointed out in the briefing that I think,

6    probably, the Government's best case is *Merino v.*

7    *U.S. Marshal*, where there is some discussion of -- it was a

8    very brief discussion of *Brady* and --

9           THE COURT:  But aren't there are other cases,

10    though, that discuss the fact that *Brady* is particularly

11    inapplicable because the extradition context is not a

12    prosecutorial proceeding?

13           MR. BARRIENTOS:  I think, Your Honor, as far as the

14    Ninth Circuit goes, as best as I could tell, I think *Merino*

15    was the only case that specifically addressed *Brady*.  But

16    there are some important things to consider.  One was that

17    the relator was requesting the opportunity to take

18    depositions in Mexico, which is not something we're doing

19    here, and I think, probably, that request should have been

20    denied on grounds other than due process grounds.  It's just

21    not something that's available independent of that.

22           The other point is that in the Ninth Circuit's

23    decision in *Prasoprat v. Benov* -- it's a case that the

24    Government cited -- you know, it specifically talked about

25    *Demjanjuk*, and it made the point that it thought the evidence

1   that was not produced in that case was relevant to the

2   probable cause determination.  And so while there is a dearth

3   of case law in the Ninth Circuit about this, I do think that

4   the -- excuse me -- *Prasoprat* case does stand for the

5   proposition that the Ninth Circuit views *Brady* material as

6   relevant to the probable cause determination.  And I would

7   also point out that that case, *Prasoprat*, is from -- excuse

8   me -- I think it's 1993, Your Honor -- sorry -- 2003.  So

9   that is a --

10          THE COURT:  *Prasoprat v. Benov*?

11          MR. BARRIENTOS:  Yes, Your Honor.

12          THE COURT:  2005.

13          MR. BARRIENTOS:  2005.

14          In any case, it is the most recent statement by the

15  Ninth Circuit -- or discussion by the Ninth Circuit of *Brady*

16  in the context of extradition and its most recent discussion

17  of *Demjanjuk*.  So to the extent that there previous brief

18  mentions in other cases, like the *Merino* case, I think that

19  the indication here is that there is nuance here.  It's not

20  just a open-and-closed "Does Brady apply?  Does Brady not

21  apply?" and the courts need to look at specific circumstances

22  and, you know, as I've already -- I readily concede, in the

23  *Merino* case, *Brady* doesn't apply, but the issue was "Can we

24  take depositions in Mexico?" again, something we're not

25  asking for here.

1          THE COURT:  Well, let me ask you about another

2    case, then.  What do we with *Caplan v. Vokes*, which relies on

3    *Merino* -- it's another Ninth Circuit decision from 1981 that

4    relies on *Merino* and specifically says a fugitive has no

5    absolute right to introduce exculpatory evidence and the

6    Government has no duty to do so.  So even if the Court were

7    to limit its analysis here -- not -- maybe the discovery is

8    not everything the Government has.  Maybe if the Government

9    were -- if the Court were inclined to even limit it to,

10   potentially, exculpatory evidence within the confines of

11   *Brady*, *Caplan* advises that there's no absolute right even to

12   exculpatory evidence, and that's the Ninth Circuit speaking

13   directly.

14          MR. BARRIENTOS:  Your Honor, I'm not sure what the

15   Ninth Circuit meant by "absolute right" and --

16          THE COURT:  I take plain language for what plain

17   language says.

18          MR. BARRIENTOS:  Well, I understand that, but I do

19   think that courts sometimes make broad statements when --

20          THE COURT:  But we're required to live by them;

21   right?  That's what the -- the Court has its obligation to

22   follow that law as stated.  I don't get to revisit what they

23   might have meant.

24          MR. BARRIENTOS:  Sure.

25          THE COURT:  I have to take the holding for what it

1    says.

2              MR. BARRIENTOS:  Of course you have to follow the

3    Ninth Circuit, but there is a question -- you know, courts

4    decide, obviously, disputes, right, and so, if there is a

5    dispute as to whether in any circumstance a person might be

6    entitled to something and the court resolves that, then that

7    resolves that for everyone, that's what the law is; but if

8    there's a specific question about specific circumstances,

9    then I don't think that this Court is bound by broad

10   statements, especially if they use that kind of language and

11   do not specify, Okay.  Are we talking about due process?  Are

12   we talking about an extradition statute?  Are we talking

13   about some rule of procedure?

14             THE COURT:  I have --

15             MR. BARRIENTOS:  I also point out, Your Honor, that

16   I do think this case does fall into the *Demjanjuk* area

17   because it's not a case where the Government is just

18   receiving information from Mexico.  The Federal Bureau of

19   Investigations went to Mr. Rivera's residence.  They searched

20   his house.  They searched his car.  They collected items from

21   those places.  They sent them to Mexico.  And I know that the

22   Government has argued that "Well, we're just following the

23   treaty" -- and I'm not sure if the Court has the treaty in

24   front of it, but it was attached to the Government's

25   opposition as Exhibit 1.

1           THE COURT:  Right.

2           MR. BARRIENTOS:  And I would direct the Court to

3    page 17 of the treaty -- and I'm using 17 at the bottom of

4    the page.

5           THE COURT:  Okay.  Thank you.

6           What is the CM/ECF page?  Just so we make sure

7    we're on --

8           MR. BARRIENTOS:  So this is Document 36-1 on the

9    docket --

10          THE COURT:  Yeah.

11          MR. BARRIENTOS:  -- and it's page 5.

12          THE COURT:  Thank you.  And page 17 internally to

13   the document?

14          MR. BARRIENTOS:  Yes, Your Honor.

15          THE COURT:  Thank you, sir.

16          MR. BARRIENTOS:  So what I would point out here is

17   if you look at paragraph 3, it talks about the request for

18   assistance under this treaty, and the Court can see that in

19   the main paragraph it says that requests for assistance "will

20   be executed, except that the requested Party may deny a

21   request to the extent that" -- and then it lists several

22   different circumstances.  And I would point out that, you

23   know, one of these circumstances is a really broad one --

24   this is paragraph 3(b) where it talks about whether or not

25   the "execution of the request would in the judgment of the

1  requested Party prejudice its security or other essential

2  public policy or interest."

3          So the United States retains under this treaty

4  fairly broad discretion to say, "We think that this request

5  is valid, and we will go ahead and move forward with it" or

6  "We just don't think it's in our best interest, and we will

7  not go forward with it."  And the Government in this case --

8          THE COURT:  How does that in any way correlate with

9  the due process argument that you're making, though?

10          MR. BARRIENTOS:  Yes, Your Honor.  It's because in

11  *Demjanjuk* there is this discussion and there -- in subsequent

12  cases discussing *Demjanjuk* there's this point about, Well, is

13  the Government actively investigating an extradition matter

14  on its own --

15          THE COURT:  On its own.

16          MR. BARRIENTOS:  -- independent?

17          THE COURT:  Is the Government doing an independent

18  investigation of the criminal matter?

19          MR. BARRIENTOS:  Yes, Your Honor.  And --

20          THE COURT:  Alleged criminal --

21          MR. BARRIENTOS:  And so my point here is that this

22  treaty -- it's not open and shut, okay, Mexico puts in this

23  request and the U.S. Government has to follow through with

24  it.  The U.S. Government has a lot of discretion here to

25  basically say, "We don't think this request is in our best

1    interest.  We're not going to follow it."  And they did not

2    do that in this case.  They went forward with it.  There's

3    federal law enforcement searching Mr. Rivera's property.

4    There is local law enforcement in San Diego providing

5    information.  It's not clear to me whether that information

6    was provided pursuant to a request or how it came about.

7          THE COURT:  So -- I'm sorry to interrupt you again

8    peppering you with questions.

9          Is it your argument that in order to resolve this

10    discovery -- this dispute regarding what, if any, discovery

11    may be appropriate here that the Court now needs to drop down

12    a level and analyze what the United States Government's

13    assessment of its own interests were in doing whatever it did

14    -- it believed to be in accordance with the treaty?

15          MR. BARRIENTOS:  No, Your Honor.  I don't think the

16    -- Your Honor needs to reach that all because I think a very

17    straightforward application of modern due process

18    jurisprudence clearly requires discovery in this case

19    independent of what the Federal Government has done.  If the

20    Court feels differently, though, then I think it is relevant

21    because then we can look at *Demjanjuk* and say, "Okay.  Is the

22    Government" -- "the United States Government getting involved

23    in a way that is beyond just administering a request by a

24    country that it has a treaty with?"

25          And so, Your Honor, I know -- there was one other

1  point, kind of putting aside -- unless the Court has further

2  questions about the constitutional issues and whether that

3  requires discovery --

4          THE COURT:  I think I've adequately peppered you on

5  that issue.  Next issue.

6          MR. BARRIENTOS:  There is, of course, the scope --

7  the question about the scope of discovery, if it is

8  appropriate.  And, you know, I sent out a request to the

9  Government.  I tried to follow up and to see if there were

10  any issues that could be narrowed.  The -- excuse me.

11  Your Honor has seen the response.  So at this time I'm happy

12  to talk to the Government and see if -- you know, because it

13  could be that there are just some categories of the requests

14  that the Government doesn't have any discovery that's

15  responsive, and if that's the case, you know, I would accept

16  their representations on that at this point, but I just don't

17  know, and so I am happy to talk about that.

18          At this point I don't know that I have that much to

19  add to it aside from -- again, going back to constitutional

20  concerns.  The scope of the issues in extradition hearings, I

21  think, is broader than the Government is letting on, and

22  there are numerous circuits, including the Ninth Circuit,

23  which have said, "Okay.  You know, "Relators can challenge

24  the" -- "on constitutional grounds the evidence that the

25  Government is attempting to use in an extradition

1   proceeding," and so, you know, the main example that's come

2   out of the Ninth Circuit is, okay, has a witness been

3   tortured?  And that's the *Santos* case.  It specifically

4   discusses the constitutional dimensions and concerns that are

5   implicated when the Government tries to use evidence that is

6   procured by torture.

7         THE COURT:  We have no such evidence, purportedly,

8   here; correct?

9         MR. BARRIENTOS:  Not at --

10        THE COURT:  As to torture?

11        MR. BARRIENTOS:  Not at this time, Your Honor.  Not

12   at this time.  I will say, though, that --

13        THE COURT:  But wait.  Hold on.  Your discovery

14   request is for the evidence that the Government has already

15   provided.  So in the -- you know, the identification

16   materials, the Homeland Security information -- provided the

17   search of the cell phones, the search of the home, residence,

18   et cetera, et cetera.  There's no evidence -- as the Court

19   understands it, and correct me if I'm wrong.  None of that

20   evidence pertains in any way to any evidence of torture; is

21   that correct?

22        MR. BARRIENTOS:  Your Honor, I don't know because I

23   don't -- I don't think --

24        THE COURT:  You certainly haven't alleged it in

25   your papers or even the possibility of it.

1          MR. BARRIENTOS:  I certainly acknowledge that I

2    don't have a basis to say so right now.

3          THE COURT:  Okay.

4          MR. BARRIENTOS:  But I would also just point out

5    that this is something that can come up unexpectedly, and

6    I'll point out a colleague of mine had a recent extradition

7    case -- I think it was in Riverside -- where the matter took

8    years and there was years-long investigation and there was

9    evidence of torture that came up eventually, kind of at the

10   last moment right before the final probable cause hearing,

11   and that evidence turned out to be valid, but it took a long

12   time to discover because, of course, the attorneys working

13   that case had to go down to Mexico, they had to talk to

14   witnesses, who it turned out had been tortured, and so there

15   are all kinds of concerns.

16         And so at this time I certainly admit that I don't

17   have a basis to say that there is torture involved, but I

18   would just point out that we are early into our investigation

19   -- we'll raise this later, but we do anticipate asking for an

20   extension given our ongoing investigation, and that could

21   come up in the future.  I just don't know at this time.

22         THE COURT:  All right.  So -- and this Court's not

23   inclined to issue advisory opinions.  So let me just confirm

24   that.

25         Anything further, Mr. Barrientos, before I turn to

1  the Government?

2          MR. BARRIENTOS:  I don't think there's anything

3  further at this time.  The only thing I would just point out

4  -- I don't know if the Court has specific questions about

5  specific requests.  It might be best to let the Government

6  give its position on whether specific requests are overbroad

7  or could be narrowed or anything else and then address it

8  after that.

9          THE COURT:  All right.  Thank you so much.

10          MR. BARRIENTOS:  Thank you.

11          MR. LULEJIAN:  Thank you, Your Honor.  May it

12  please the Court.

13          Before I begin, I want to thank both the Court and

14  counsel and the fugitive for accommodating me with my recent

15  injury.  I'm going to try to stand as long as I can today,

16  and if for some reason my back starts going out, I may ask

17  the Court to sit down, but I'm going to try to see if I can

18  do this on my feet.

19          THE COURT:  All right.  And you know that lectern

20  can be lowered --

21          MR. LULEJIAN:  Thank you very much.

22          THE COURT:  -- if you need to do so.

23          MR. LULEJIAN:  Will do.  I think we're fine,

24  Your Honor.

25          THE COURT:  All right.  Thank you.  Please proceed.

1          You've heard me engage with Mr. Barrientos, defense

2    counsel, on the issues the Court regards -- the Court is

3    concerned about, particularly the applicability of the due

4    process protections in the extradition context and the

5    absence or sparsity of any Ninth Circuit authority that

6    expressly follows the Sixth Circuit analysis that

7    Mr. Barrientos strongly relies on.  But go ahead.

8          MR. LULEJIAN:  I think Your Honor has hit on most

9    -- many of the points I was going to raise.  I mean, when

10   you're dealing with discovery, you've got a body of case law

11   that says there's really not much discovery in extradition

12   cases.  It talks about the magistrate judge's inherent

13   authority, but when it talks about that, it doesn't talk

14   about where it comes from.  So it comes, I think,

15   specifically from the position in which Your Honor is sitting

16   in this proceeding.

17          We do know that, based on the *Merino* case, it

18   doesn't come from the Sixth Amendment.  We know there's

19   nothing in the statutes about it.  We know that in -- at

20   least in the bail context the Fifth Amendment certainly

21   doesn't apply, and I don't think Mr. Rivera nor the

22   Government were able to find a case specifically on point

23   that says that the Fifth Amendment applies in an extradition

24   case.

25          When we talk about due process, we're talking about

1    procedural due process, and I think one of the things that

2    distinguishes procedural -- the procedural due process in an

3    extradition matter versus the other matters that Mr. Rivera

4    has cited is that Mr. Rivera be entitled to a hearing before

5    a neutral magistrate.  He'll have a chance to challenge

6    evidence.  He'll have a chance to see what's before him and

7    have a chance to go through the process.

8         In the no-fly -- in the no-fly cases, those were

9    decisions based on what the Government made.  On the enemy-

10   combatant cases, the courts were concerned about the

11   Government taking individuals out before the court could get

12   to them.  In the immigration case, from what I remember, the

13   -- both the immigration court nor the person that was going

14   to be deported had access to the "A file," which is the

15   absolute substance of what the proceeding is about.

16        Here, we're in a very limited role.  We take

17   primarily what is in the -- we take almost exclusively what's

18   in the extradition request submitted by the foreign country,

19   and the only time evidence is allowed to come in other than

20   that is when it's explanatory.  And we can get into that down

21   the line, and we've talked about that a bit in our

22   extradition memo, and I think Your Honor and I have -- we've

23   dealt with that in other cases as well.  We can go through

24   that again here.

25        Let me short-circuit some of the issues here, and

1    I'll -- and let me talk about the *Demjanjuk* case for a while.

2         I remember that case when it happened, and it's a

3    fascinating case, but the big difference between the

4    *Demjanjuk* case and the other cases here is you had two

5    investigations going on.  You had the investigation -- Israel

6    -- for the extradition to try him for war crimes.  You also

7    had an investigation going on by the United States

8    Government, both by, I think, the Office of Special

9    Prosecutions, which was prosecuting Nazis that had come to

10   the United States, and I believe in that time they had gotten

11   the United States Attorney's Office involved.

12        And there's some -- and I looked at the case last

13   night quickly, and there was some discussion about how the

14   involvement of the U.S. Attorney and the involvement of the

15   Office of Special Prosecutions and the way they conducted

16   that case for their own needs, which was specifically to

17   determine whether or not we were -- the U.S. was going to

18   strip Mr. *Demjanjuk* of his citizenship --

19        THE COURT:  Citizenship.

20        MR. LULEJIAN: -- was a criminal case.

21        You don't have anything like that here.  You have

22   -- what you have is an investigation taking place only in

23   Mexico.  What the United States did was comply with the

24   extradition and to address the mutual legal assistance

25   requests.  As the prosecutor on the case, I will tell you we

1    were very careful to make sure that this did not turn into a

2    criminal case on the United States's side.  We don't intend

3    to prosecute Mr. Rivera based on what we have at this point.

4    So we don't have an open criminal investigation.

5             We got the FBI involved to help out with the search

6    warrant.  I was involved in the drafting of the search

7    warrant, and I will tell Your Honor that there is nothing I

8    have seen in this case that's exculpatory.  I'm happy to put

9    that on the record, that I have seen absolutely nothing in

10   this case that's exculpatory.  And while I'm not going to

11   comment about the policies of the United States Attorney's

12   Office, I can tell you that when I write a -- when I work on

13   an -- when I work on a search warrant or I work on a filing

14   with the court and there's exculpatory information, I

15   generally put it before the judge because I believe that the

16   judge needs to see what's good and bad in order to make that

17   determination, and in this case there was absolutely nothing

18   there that we would view as exculpatory.  So --

19             THE COURT:  Well, let me back up --

20             MR. LULEJIAN:  Certainly.

21             THE COURT:  -- let me ask you to back up a second,

22   then --

23             MR. LULEJIAN:  Sure.

24             THE COURT:  -- because you go straight to the issue

25   that there is nothing exculpatory, which would relate to the

1   *Brady* obligations to --

2           MR. LULEJIAN:  Yeah.

3           THE COURT:  -- *Brady* disclosures, but you have not

4   addressed whether there is -- the Court should make an

5   independent finding that *Brady*'s not even applicable here.

6           MR. LULEJIAN:  Well, I think Your Honor can

7   certainly do that --

8           THE COURT:  Because we only get to exculpatory if

9   the Court finds that *Brady* is applicable and that we need to

10  do an analysis under *Brady* and then whether the Government

11  would then be required to disclose on that basis any

12  information it has that is exculpatory.

13          MR. LULEJIAN:  Your Honor, thank you very much.

14  I'm sorry to jump around a little bit.

15          I mean, there -- the last ruling by the

16  Ninth Circuit was the *Merino* case that had said that *Brady*

17  does not apply.  We have a case called the *Ameen* case out of

18  the Eastern District of California -- I think in 2019, was

19  it? -- that cited *Merino*, and we've got some other cases that

20  we've cited *Merino* in.  But the bottom line is that *Brady*

21  doesn't apply, and you can't bootstrap *Demjanjuk* in because

22  the facts are so different.  Again, you're dealing with two

23  -- you're dealing with a case in which you've got an

24  investigation -- a criminal investigation in the

25  United States which would bring in, then, the constitutional

1    protections.  Because that's not here, Your Honor, you don't

2    -- there -- it wouldn't come in.  So the position of the

3    Government, Your Honor, is that *Brady* is not applicable.

4            But again, Your Honor, the question comes -- I

5    think what it boils down to -- and I've been wrestling with

6    this the last few days -- is do you really need to even get

7    to the constitutional issues?  Because the Court has the

8    inherent ability to go ahead and order discovery, and it's

9    not -- and it doesn't have to be mutually exclusive that "Oh,

10   the Constitution says you have to do this.  The judge needs

11   to do that," because, when you see those cases such as the

12   *Oen* case, you look at things such as *Prasoprat*, where they

13   talk about where, you know, the magistrate is allowed to do

14   this.  It talks about the inherent nature of the magistrate.

15   It comes out of the inherent -- inherent role.  They don't

16   talk about the Constitution coming into play.

17           So, Your Honor, the question is, is do you even

18   need to make a finding as to this?  I mean, you can certainly

19   say that "Based on my inherent power, I have reviewed this

20   and that I have determined that there is no" -- there either

21   is or is not any discovery, and then you do it within the

22   framework that Your Honor outlined, whether or not it

23   converts it to a dress rehearsal for trial or whether or not

24   it is a -- whether or not it appreciably advances the issue

25   before the Court.

1        So I guess it's a balancing act.  I mean, our

2   position would simply be what we put in our papers: The

3   Sixth Amendment doesn't apply.  The Fifth Amendment apply --

4   doesn't apply.  But in trying to come up with an analogy of

5   this, Your Honor, I wonder if the Court even needs to go that

6   far.  I think the Court can certainly make its decision

7   simply based on its inherent power and do what you would do

8   in a statutory interpretation case, which is to rely on the

9   maxim of construction, says, "I don't need to look" -- "If I

10  can find an alternative to the constitutional argument, I

11  don't need to go there."

12       So I don't -- you know, that goes sort of both

13  ways, but I certainly think that you can make your decision

14  based on your authority without having to say the

15  Constitution -- that it applies.  Because, if the

16  Constitution does apply -- if you say that -- if you say

17  *Brady* doesn't apply and the Sixth Amendment doesn't kick in,

18  I mean, the issue of exculpatory is gone.  It just says it's

19  not -- it's not allowed in there.  But if --

20            THE COURT:  But let me interrupt you, then --

21            MR. LULEJIAN:  Certainly, Your Honor.

22            THE COURT:  -- Mr. Lulejian.  If the Court -- even

23  if the Court were to follow your guidance -- is -- were

24  persuaded by your guidance that I don't need to reach the

25  constitutional issue at all but can simply make a

1   determination of this motion based on the Court's inherent

2   authority, if that were the case, where should the Court draw

3   the line as to some, none, all of the specific discovery

4   that's being requested here?

5            MR. LULEJIAN:  I think -- that's a good question,

6   Your Honor.  I think your --

7            THE COURT:  That's why I asked you.

8            MR. LULEJIAN:  I see where Your Honor is going.  I

9   mean, you certainly -- the question then is does the

10  constitutional argument somehow color or impact how you draw

11  that line?  And I think the answer -- the answer is that you

12  can certainly look to -- you can look to that.  You can

13  certainly say, "Yeah, that the Ninth Circuit has said that

14  *Brady* doesn't apply and that, in my inherent power, I'm being

15  guided by that."  I guess that is a determination somehow of

16  the constitutionality of it.

17           THE COURT:  Doesn't the Court always function

18  within a constitutional context?

19           MR. LULEJIAN:  You certainly do, Your Honor.  But

20  again, in this case you have explicit -- you have an explicit

21  statement by the Ninth Circuit that the Sixth Amendment and

22  *Brady* and its progeny don't apply, and again, you've got

23  nothing affirmatively that says that the Fifth Amendment

24  applies in this context other than to say that there's

25  procedural due process, and we have plenty of case law that

1   we've cited that says that the fact that you're having an

2   extradition hearing before a neutral magistrate fulfills

3   procedural due process.

4       So I guess the answer, Your Honor, is that there is

5   nothing compelling the Government to produce discovery as you

6   would in a criminal case.  The issue then turns on whether

7   the magistrate judge says that "In this context, under this

8   set of facts, in this arena am I going to order some

9   discovery or not based on what's out there and what those

10  limitations are?"

11      I don't mean to dance around it, Your Honor.  It's

12  not always -- it's clear, on one hand, but yet it's not.  We

13  don't have -- and these issues oftentimes don't go up.  So we

14  don't have -- we don't have specific decisions on some of

15  these other than the ones that we have, and when you go back

16  and you look at cases like *Merino*, you go back to -- even

17  cases like *Quinn v. Robinson*, which are some of the older

18  cases, you don't have a great deal of discussion in those

19  cases.  The court just makes a statement and -- you know, and

20  it's just -- and it's followed down the line.

21      THE COURT:  All right.

22      MR. LULEJIAN:  I'm not trying to discount the

23  validity of those decisions.  It's just not litigated.  It's

24  -- there are areas of the law, Your Honor, we just don't see

25  a lot of litigation on.  There are other areas we see a

1  tremendous amount of litigation on.  This isn't one of them

2  specifically because we're not dealing in the criminal

3  context, and we don't have, generally, any obligations under

4  the criminal rules or the Constitution with respect to

5  discovery in this.

6          THE COURT:  All right.

7          MR. LULEJIAN:  I think you'd have a very different

8  situation, Your Honor, if you didn't have a -- you didn't

9  have the extradition hearing going forward, you didn't have

10 the information that the defense needed in front of --

11 defendant -- I'm sorry -- excuse me -- the fugitive needed in

12 front of him as to what he's being -- what the extradition is

13 being sought for.

14         And again, Your Honor, this isn't a determination

15 of guilt or innocence.  In many ways it's just simply the

16 probable cause hearing you have even before an indictment and

17 in which -- and in those cases, Your Honor, there is solid

18 case law that says that a criminal defendant wouldn't be

19 entitled to discovery prior to that.  So the question then

20 comes as why should somebody in an extradition context get

21 more constitutional protection than one would be afforded on

22 the criminal side?  I guess I'm trying -- I'm glossing over

23 that pretty quickly, but it's laid out in our papers.

24         THE COURT:  That's fine.

25         Anything else specifically you want to address the

1  Court given the questions that I've been asking and the

2  issues I've been grappling --

3           MR. LULEJIAN:  No.  I think --

4           THE COURT:  -- with on both sides?

5           MR. LULEJIAN:  Sorry to interrupt, Your Honor.

6           I think Your Honor has identified the key issues,

7  and you seem to be focusing on what they are.  We're

8  certainly -- we're relying on what we've put in there.  If

9  there's any further briefing Your Honor wants on any specific

10 issue, we're happy to do this.  I will tell you, however, we

11 spent a lot of time looking to see what we could find on the

12 Fifth Amendment, on whether or not there were any affirmative

13 cases, not only in the Ninth Circuit but around the country,

14 and we weren't able to find anything specifically said that

15 under the Fifth Amendment this type of discovery is required.

16 Again, it's sort of being "backdoored," as it is, coming in

17 the case.

18           I would like to talk a bit about the search warrant

19 for a minute and the procedural posture that we're in and the

20 difficulty we have in going forward with that.  As I said a

21 minute ago, we're not aware of any exculpatory information in

22 this case.

23           With respect to the search warrant, Your Honor,

24 that was done under a mutual legal assistance request from

25 Mexico, and we put a copy of the treaty in there, and in the

1   treaty it talks about the request for confidentiality, and in

2   this case, even though Mexico certainly said that we received

3   information through a mutual legal assistance request, they

4   have not authorized the United States to give out anything

5   more publicly than what's there.  I will tell you that

6   Magistrate Judge Eick was the one who signed the warrant.  If

7   the Court would like, I'm happy to provide your courtroom

8   deputy with a copy of -- with the case number.  If the Court

9   determines that it needs to go and take a look at the

10  affidavit and the return, I checked last night.  Everything

11  is on the computer system so --

12          THE COURT:  All right.  Could you give me that case

13  number, Mr. Lulejian?

14          MR. LULEJIAN:  Certainly.  I don't have it with me

15  right now, but I can certainly pull it and give it to you as

16  soon as the hearing is done if that's acceptable?

17          THE COURT:  All right.  Thank you very much.

18          MR. LULEJIAN:  But the problem we have, Your Honor,

19  is that if we are required to hand -- we are required to open

20  up the mutual legal assistance proceedings and what goes

21  around that.  We are in a -- the Government is in a position

22  in which we're going to have diplomatic ramifications.  In

23  addition, it puts us in a position where we may have to

24  violate the terms of the treaty.  And I realize that the

25  Court can certainly order that, but that's -- at the end of

 1  the day, that's where we're at.  We're being put in the

 2  position in which we have to disclose something that's not in

 3  the treaty.  And the other thing on the treaty we point out,

 4  Your Honor, is that there is no private right to an

 5  individual.  So it really is government to government.  It's

 6  not coming -- it's not something that they can delve into.

 7         With respect to the information that came out, I

 8  will tell you that there were two mutual legal assistance

 9  requests in this case.  Both of them have been noted by the

10  Mexican Government in their papers.  One has to do for

11  telephone records, I believe, from T-Mobile.  Those were all

12  produced -- or at least my understanding is produced.  That

13  mutual legal assistance was executed in another district.

14  And then the search warrant, which was extradited in this --

15  which was executed in this district and I had a hand in.

16         THE COURT:  One is for T-Mobile, and the other was

17  for the residence; correct?

18         MR. LULEJIAN:  For the residence.  And I will tell

19  you this, Your Honor, because -- and while the search warrant

20  certainly went to the residence itself, when the agents got

21  there, they realized there was a car there, and Mr. Rivera's

22  father consented to a search of the car.  And when one --

23  when you see the return, Your Honor, I believe that the copy

24  of that waiver -- or that waiver to search was -- consent is

25  attached to the return by the FBI agent.  So that's how the

1    search took place.

2         With respect to the information from the -- from, I

3    guess, CBP with respect to the border crossings, with respect

4    to the information from San Diego, those were not done

5    through the -- those were not done -- I -- through mutual

6    legal assistance requests.  I believe they were just done

7    between the two -- between the law enforcement partners,

8    between the two agents -- between the countries.

9         I've -- with respect to one of the issues that was

10   raised was the question of, you know, the -- they wanted to

11   see the videos of him crossing.  I've seen the videos.  The

12   photographs seem to show that he was -- he crossed at that

13   time.  And if you're looking for crossing records other than

14   on the days, they're not really relevant to this case.  The

15   crossing records for both of the crimes for which he's been

16   charged are there.  Now, I will tell you, having found this

17   in other cases, that we don't have -- in most cases -- and I

18   think this is one of those cases as well -- we don't have

19   when they cross into Mexico.  We only have it when they come

20   back out of Mexico.  So that's just the way the records are

21   maintained.  Should we, obviously, find something different,

22   I will alert the Court and alert counsel.

23        There are other things -- and, Your Honor, I looked

24   through the discovery requests, and it pretty much tracks the

25   discovery requests in a criminal case.  It's been fine-tuned

1  a little bit, but things such as criminal history, it's not

2  relevant.  It's not being relied on by Mexico.   At the end

3  of all this, what we're really being confined with are the

4  four corners of what Mexico has submitted unless we start

5  getting into other evidence.

6         I will tell Your Honor that we're not aware of any

7  evidence of torture.  The case that Mr. Barrientos was

8  referring to was a case called *Castro Martinez*, which was

9  recently before Magistrate Judge Kewalramani in Riverside.  I

10 litigated that case, and we had found out -- and there was

11 something that -- the issue of torture came out, Mexican

12 Government denied it took place, the magistrate judge

13 determined however that he was going to use that to assess

14 credibility, and that's really where the *Santos* case comes

15 from.  And I think Your Honor and I did this a number of

16 years ago in a case involving El Salvador.  I'd have to go

17 back and take a look at that case -- *Parento* (phonetic) -- or

18 something along those lines.

19        But again, it's not really an interpretation of the

20 constitutional right to discovery.  It's whether or not there

21 is any -- whether or not evidence of torture or coercion

22 qualifies as explanatory evidence.  That's really where it

23 comes down to in the extradition context.  So -- and, you

24 know, he points out the *Oen* case, which is another one of my

25 cases.  I mean, in that case Magistrate Judge Rosenbluth felt

1    that the testimony of a -- of an expert was relevant somehow

2    to her determining the credibility of North Korean --

3    credibility of North Korean witnesses and their statements.

4    But again, we're not talking about discovery in those cases.

5            Again, Your Honor, I'm not aware of anything out

6    there that's exculpatory.  Obviously, if that changes, we

7    will certainly -- (indecipherable) would have an obligation,

8    I think that we would certainly come forward with that and at

9    least let the Court know, in camera, what's going on.

10           But unless the Court has any other questions, I'll

11   submit on our papers.  Again, we're happy to brief anything

12   further that Your Honor wants, but I think we've pretty much

13   beaten this horse as dead as we can at this point.

14           THE COURT:  All right.  Thank you, Mr. Lulejian.

15           MR. LULEJIAN:  Thank you, Your Honor.

16           THE COURT:  Mr. Barrientos, any -- a brief

17   rebuttal?

18           MR. BARRIENTOS:  Yes, Your Honor.

19           I want to start off by -- I just want to put this

20   on the record, that we do request that the Government provide

21   any evidence relevant to the claimed consent to the search of

22   the car.  That sounds like that is outside the scope of a

23   request for mutual assistance from the -- from Mexico.  So

24   that does sound like an area where the United States

25   Government is doing its own investigation affirmatively.  So

1    I think that alone right there adds to the relevance and

2    applicability of the *Demjanjuk* case.

3        We'd also ask that the Court do review the search

4    warrant that the Government has represented authorized the

5    search of Mr. Rivera's residence.  In -- for a number of

6    reasons, and one is that the extradition treaty has pretty

7    particular language about what is to be confidential.  It

8    says that -- and this is at Docket No. 36-1, page 6 -- "The

9    requested State shall keep confidential a request and its

10   contents unless otherwise authorized by the Coordinating

11   Authority of the requesting Party," and then it goes on a

12   bit.

13       But the point here is that it's the request itself

14   and its contents.  Now, I think we know that there has been a

15   request because that's been represented, I think, in the

16   filings and in court.  What's not clear to me, not having

17   seen the warrant, is that -- is whether the warrant or the

18   application in any way -- is it simply the Government

19   submitting the request provided by Mexico, or does the

20   Government receive the request and then put together its own

21   application and submit something?

22       Because I think, if the Government is putting

23   together its own application, then that is not qualified as

24   the request itself, and so I think, if that is the scenario,

25   that the Court should certainly take a look at that and order

1    that any warrants or relevant material be produced.  And I

2    think that would be relevant because, as has been recognized

3    by a number of courts, you can challenge the -- on the -- on

4    a constitutional basis the evidence that the Government

5    attempts to use.  So, if there is a problem with that

6    warrant, Mr. Rivera should be able to look at it and identify

7    the problems and raise any issues that are appropriate with

8    the Court.  I think that is pretty well in line with the

9    Ninth Circuit's decisions about torture, which does

10    specifically talk about due process and not just the

11    explanatory exculpatory dichotomy that courts have talked

12    about in the extradition context so --

13            THE COURT:  So let me ask you this, then: Assuming

14    the Court is persuaded by that position, why would this

15    independent discovery request be the appropriate context in

16    which the Court to analyze that, as opposed to -- if you're

17    going to challenge what the Government is relying upon in

18    making its request for extradition, why wouldn't the

19    appropriate forum to make that challenge be when you file

20    your opposition to the extradition request for certification

21    itself?

22            MR. BARRIENTOS:  Well, so --

23            THE COURT:  Because, if that's what you're going to

24    challenge, you know, the "extraditability" of Mr. Rivera,

25    that is not what is at issue in this discovery motion, and

1    this is not where the evidence is being presented about

2    whether or not the standard for certification of extradition

3    has been met.

4              MR. BARRIENTOS:  No.  I agree with you about that.

5    We're of course not deciding that right now, but I think --

6    and maybe I need to rephrase to be more clear.

7              THE COURT:  The discovery issue and the extradition

8    issue sounded like they were going to get conflated in the

9    argument you just made.  That's why I --

10             MR. BARRIENTOS:  Okay.

11             THE COURT:  -- raise the issue.

12             MR. BARRIENTOS:  So maybe I can clarify my point a

13   little bit.

14             THE COURT:  Uh-huh.

15             MR. BARRIENTOS:  My point is just this: If there is

16   a warrant and a warrant application that is not required to

17   be confidential under the treaty, I think under the due

18   process clause, Mr. Rivera would have a right to look at that

19   warrant, see if there are any constitutional deficiencies in

20   it, and challenge it and the Government's later reliance at

21   the extradition hearing.  Now, of course we can't challenge

22   that warrant if we don't see it.  So that's why I think

23   there's that interplay with the discovery requests.  We would

24   ask for that warrant if the Court determines that it is not

25   covered by the confidentiality provision in the treaty.

1          And I would also just add, too, that I do think

2     this treaty notwithstanding, it cannot -- it doesn't take

3     precedence over the Constitution, and so, you know, I might

4     submit supplemental briefing on whether or not I think --

5     regardless of whether or not this treaty requires

6     confidentiality, whether there's a constitutional concern

7     beyond that.

8          THE COURT:  So now we're going to challenge the

9     underlying treaty?  Again, isn't that part of the extradition

10    proceeding itself and not part of this discovery -- this

11    discrete discovery motion that we have before the Court?  If

12    you're going to go after the treaty that forms the

13    fundamental basis on which the requests for extradition and

14    certification is going to be based, isn't that part of that

15    proceeding and not here?

16         MR. BARRIENTOS:  But to be clear, these are

17    different treaties.  The treaty for mutual assistance, I

18    think, is separate from the extradition treaty.  So they're

19    --

20         THE COURT:  But isn't the treaty for mutual

21    assistance, which is the basis on which any information

22    obtained in the United States was provided, pursuant to the

23    provisions of those requests of that treaty, not just the

24    extradition treaty?

25         MR. BARRIENTOS:  Uh.

1          THE COURT:  They're working concomitantly?

2          MR. BARRIENTOS:  So, yes, they are kind of working

3    together.  The Mexican Government makes these requests

4    pursuant to the --

5          THE COURT:  Right.

6          MR. BARRIENTOS:  -- mutual assistance treaty.  Then

7    it use that -- whatever evidence is returned and --

8          THE COURT:  In support of the extradition --

9          MR. BARRIENTOS:  -- supported the extradition

10   treaty.

11         THE COURT:  -- the treaty which would permit

12   extradition -- satisfied.

13         MR. BARRIENTOS:  And I guess my point is just that

14   we are asking for discovery about the warrant, and the

15   Government has raised a concern about whether the treaty

16   requires confidentiality that would prevent its production of

17   the warrant.  And so all I'm saying here is that I think the

18   treaty is very specific about what should be confidential and

19   what should not.  I don't know, not having seen the warrant,

20   whether this treaty would cover that as far as

21   confidentiality.  So I do request that the Court take a look

22   to make that determination.

23         A couple other points that I think are pretty

24   important: One, I think the Court made a comment about

25   *Demjanjuk* and *Brady* being the most important issue here, and

1  I don't think that's quite the position of Mr. Rivera.  I

2  think those cases -- *Demjanjuk* certainly supports his request

3  for discovery, but I do not think it's the "end all, be all"

4  because of *Mathews v. Eldridge* and all of that due process

5  jurisprudence which occurs outside of the criminal context

6  and which requires discovery.

7         THE COURT:  I don't think I said they were the most

8  important cases.  I certainly didn't intend to say that.

9  What I said are those -- particularly *Demjanjuk* -- as a --

10  and with the order attached to the briefing from the

11  Sixth Circuit is heavily -- most heavily relied upon.

12         MR. BARRIENTOS:  Okay.  If I misunderstood -- I

13  did.

14         THE COURT:  I don't want to --

15         MR. BARRIENTOS:  I just want to make it very clear

16  --

17         THE COURT:  Yeah.  Okay.

18         MR. BARRIENTOS:  -- that our position is that the

19  Court doesn't need to reach the *Brady* issue at all to order

20  discovery.

21         The one other thing that I do want to point out --

22  or I guess, maybe, two other things kind of briefly -- is

23  that the most recent -- would just reiterate the most recent

24  Ninth Circuit decision discussing *Brady* in the context of

25  extradition is the *Prasoprat* case from 2005, where the court

1  specifically says that the evidence that was suppressed in

2  *Demjanjuk* was relevant specifically to the probable cause

3  determination.

4          The other point that I want to make is that this is

5  not -- regardless of the scenario, due process always

6  applies.  I mean, we're in the United States.  We have a U.S.

7  citizen here who is fighting for his personal liberty, for

8  his ability to stay in the United States.  There is no

9  extradition exception in the Constitution.  There's no -- I

10 don't think I came across any exceptions to the *Mathews v.*

11 *Eldridge* analysis.  I think the question is not does *Mathews*

12 apply?  Does it not apply?  It does apply whenever a liberty

13 interest is at stake and it's being taken away or might be

14 taken away, and then the question is, okay, going through

15 those factors, how -- what is the outcome based on the

16 interests at stake?

17         And I think -- unless the Court has any further

18 questions, I think we'll submit on that.  Again, it's just a

19 straightforward application of well-established jurisprudence

20 about due process.  This is a case where someone's liberty is

21 at stake, due process applies, and the Court should go

22 through that analysis and apply *Mathews*.

23         Thank you.

24         THE COURT:  All right.  Thank you, Mr. Barrientos.

25         Okay.  All right.  Having -- thank you, both

1    counsel, Mr. Lulejian, Mr. Barrientos, for, one, your

2    patience with the Court's many questions and for your very

3    thorough, both, briefing and oral argument on this issue.

4    They are somewhat nuanced, and the Court is going to take the

5    motion under submission and issue a written order.

6            In the interim, the Court will grant the request to

7    vacate the -- or suspend, for now, to continue the date for

8    the hearing on the extradition briefing itself pending a

9    resolution of this motion.  So I will get that -- you

10   provided a separate proposed order on that issue, I believe,

11   Mr. Barrientos.  I had it on my desk, and it looks like I

12   didn't --

13           MR. BARRIENTOS:  Yes, Your Honor, we --

14           THE COURT:  Ah.  Here it is.

15           So I have the proposed order re: the briefing

16   schedule.  That request is going to be granted, and I will

17   date it today, while we get this fully resolved.

18           So the deadlines for Mr. Rivera's opposition to

19   extradition and the Government's reply are vacated.  Once the

20   Court has ruled on Mr. Rivera's pending motion to compel

21   discovery, the parties shall confer and propose a new

22   briefing schedule and, if necessary, a new date for

23   Mr. Rivera's probable cause hearing.

24           And I will accept that order and sign it dated

25   today, which is December 7th; correct?

1          MR. LULEJIAN:  Yes.

2          MR. BARRIENTOS:  Yes, Your Honor.

3          THE COURT:  2-0-2-3.

4          So that is the one order that will -- one matter

5    that will get finalized today.

6          Anything further, Mr. Lulejian?

7          MR. LULEJIAN:  The only question I have,

8    Your Honor, is so the extradition hearing is still scheduled

9    for February the 14th?  Just the briefing schedule has been

10   suspended?

11         THE COURT:  The briefing schedule has been

12   suspended.  If we need to move the extradition hearing date

13   at some point, depending on when it takes -- how soon the

14   Court gets this motion --

15         MR. LULEJIAN:  Understood, Your Honor.

16         THE COURT:  -- resolved, we may revisit that issue

17   either by stipulation, or I'll reach out to the parties and

18   vacate the hearing date myself, and then you can confer about

19   a mutually convenient date.

20         Mr. Barrientos?

21         MR. BARRIENTOS:  No, Your Honor.  Thank you.

22         MR. LULEJIAN:  Thank you very much, Your Honor.

23         THE COURT:  Does that work for you?

24         MR. BARRIENTOS:  I was just confirming that that

25   was my understanding, too.

1          THE COURT:  Yeah.  Exactly.  That will work.

2          All right.  Thank you very much.

3          MR. LULEJIAN:  Thank you, Your Honor.

4          THE COURT:  Whatever holiday you celebrate at your

5     house, I hope you do it well, enjoy it, and safely, and thank

6     you all very much.

7          MR. LULEJIAN:  Thank you, Your Honor.

8          MR. BARRIENTOS:  Thank you.

9          THE CLERK:  Court is adjourned.

10         (Proceedings adjourned at 12:06 p.m.)

11     ///

12     ///

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                              CERTIFICATE

5           I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa_____         January 24, 2024_____
     Julie Messa, CET**D-403        Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25