CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
J. ALEJANDRO BARRIENTOS (Bar No. 346676)
(Email:  Alejandro_Barrientos@fd.org)
HOWARD SHNEIDER
(Email: Howard_Shneider@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
BRYANT RIVERA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cv-08153-MCS-KS |
| Plaintiff, | **BRYANT RIVERA'S OPPOSITION TO THE GOVERNMENT'S REQUEST FOR CERTIFICATION OF EXTRADITABILITY; EXHIBITS A-J.** |
| v. | |
| BRYANT RIVERA, | |
| Defendant. | |

i

Bryant Rivera, through undersigned counsel, opposes the government's request for certification of extraditability, ECF No. 32. This opposition is based on the attached memorandum of points and authorities, exhibits, all pleadings and records in this case, and any further argument or evidence that the Court might consider.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 16, 2024          By  /s/ J. Alejandro Barrientos
                              J. ALEJANDRO BARRIENTOS
                              HOWARD SHNEIDER
                              Deputy Federal Public Defenders
                              Attorneys for Bryant Rivera

TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 7

ARGUMENT ........................................................................................................ 9

I. Extradition would violate the requirement of dual criminality and the rule of specialty. ................................................................................................................ 9

    A.    The U.S.-Mexico extradition treaty does not cover femicide and the dual criminality requirement is not otherwise satisfied. ........................................ 9

    B.    Certification would violate the rule of specialty. ...................................... 13

II. There is not probable cause to believe Mr. Bryant Rivera committed femicide as defined in Article 129 of the criminal code of Baja California. .................................... 14

    A.    The government has not established probable cause to believe that Mr. Rivera took the life of a woman for "Gender-based reasons" as required by Article 129 of the Baja California criminal code. ............................. 15

    B.    The Court cannot consider any evidence seized by the U.S. government from Mr. Rivera's vehicle because it was the product of an illegal search and seizure. ......................................................................................... 16

III. Certification of extradition would violate Mr. Rivera's right to procedural due process because he was unconstitutionally denied discovery, in part because of the government's incorrect representations at the hearing on the motion to compel discovery. ............................................................................................................. 17

IV. The Constitution, Convention Against Torture, and Foreign Affairs Reform and Restructuring Act of 1998 prohibit certification of Mr. Rivera's extradition because there is a substantial likelihood that he will be tortured in Mexico. ........................... 17

    A.    CAT, FARRA, and the Fifth Amendment prohibit the U.S. government from extraditing its citizens to countries where they are likely to be tortured. ............................................................................................. 18

        1.    *CAT and FARRA prohibit extradition when there is a substantial likelihood of torture in the requesting country.* .............................. 18

        2.    *The substantive due process component of the Fifth Amendment prohibits extradition where there is a substantial likelihood of torture in the requesting country.* ................................................. 20

        3.    *The equal protection component of the Fifth Amendment prohibits extradition where there is a substantial likelihood of torture.* ........................................................................................ 22

    B.    The Court can consider the likelihood of torture at this stage. ................. 24

        1.    *Due process requires consideration of torture.* ............................ 24

        2.    *The rule of non-inquiry does prevent consideration of torture at this stage.* ......................................................................... 26

C.    There is a substantial likelihood that Mr. Rivera will be tortured if he is extradited to Mexico. ................................................................................... 28

    *1.*   *The U.S. Department of State has repeatedly recognized that Mexico faces "significant human rights issues"—including "torture" and "harsh and life-threatening prison conditions." .....* 28

    *2.*   *As explained in Ms. Isabel C. Roby's expert report, there is a substantial likelihood that Mr. Rivera will be tortured in Mexico given the specific circumstances of his prosecution. ......................* 30

        a.   Mexico's criminal justice system suffers from the systemic use of torture. .......................................................................... 30

        b.   The risk of torture is elevated because Mr. Rivera's faces a high-profile prosecution in which the prosecuting office has publicly likened him to Ted Bundy and promised to bring additional charges not included in the request for extradition. ........................................................................... 31

        c.   The risk of torture is elevated because Mr. Rivera will be subject to mandatory pre-trial detention in one of Tijauna's various detention centers with histories of human rights abuses. .................................................................................... 32

V. The provision of the U.S.-Mexico treaty permitting extradition of U.S. nationals—like Mr. Rivera—is void for vagueness. ........................................................ 33

CONCLUSION ............................................................................................... 36

3

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

*In re Aircrash In Bali,*
    684 F.2d 1301–09 (9th Cir. 1982) ........................................................... 36

*Arnbjornsdottir–Mendler v. U.S.,*
    721 F.2d 679 (9th Cir. 1983) .................................................................. 28

*Boumediene v. Bush*
    553 U.S. 723 (2008) ............................................................................... 27

*Caiozzo v. Koreman,*
    581 F.3d 63 (2d Cir. 2009) ..................................................................... 22

*City of New Orleans v. Dukes,*
    427 U.S. 297 (1976) ............................................................................... 23

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ............................................................................... 21

*Doe v. Mattis,*
    928 F.3d 1 (D.C. Cir. 2019) .................................................................... 24

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................................... 22

*United States v. Carrillo-Lopez,*
    68 F.4th 1133 (9th Cir. 2023) ................................................................. 23

*Gallina v. Fraser,*
    278 F.2d 77 (2nd Cir. 1960) ................................................................... 28

*Garcia v. Thomas,*
    683 F.3d 952 (9th Cir. 2012) ......................................................... *passim*

*Gasho v. United States,*
    39 F.3d 1420 (9th Cir. 1994) ............................................................ 16, 17

*Gregg v. Georgia,*
    428 U.S. 153–70 (1976) ..................................................................... 21-22

*Hoffman v. United States,*
    767 F.2d 1431 (9th Cir. 1985) ................................................................ 24

4

*Johnson v. United States*,
    576 U.S. 591 (2015) ................................................................................ 36

*Khouzam v. Attorney Gen. of the United States*,
    549 F.3d 235 (3d Cir.2008) ....................................................... 20, 24, 28

*Lopez-Smith v. Hood*,
    121 F.3d 1322–27 (9th Cir.1997) .......................................................... 28

*Mainero v. Gregg*,
    164 F.3d 1199 (9th Cir. 1999) ............................................................... 28

*Marquez v. C. Rodriguez*,
    81 F.4th 1027 (9th Cir. 2023) ................................................................ 22

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................... 26

*Muradin v. Gonzales*,
    494 F.3d 1208 (9th Cir. 2007) ............................................................... 20

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) ................................................................................... 25

*Nuru v. Gonzales*,
    404 F.3d 1207 (9th Cir. 2005) ............................................................... 20

*Quijada-Aguilar v. Lynch*,
    799 F.3d 1303 (9th Cir. 2015) ............................................................... 20

*Ridore v. Holder*,
    696 F.3d 907 (9th Cir. 2012) ................................................................. 21

*Santos v. Thomas*,
    830 F.3d 987 (9th Cir. 2016) ..................................................... 17-18, 26

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ......................................................................... 36, 37

*United States v. Anderson*,
    472 F.3d 662 (9th Cir. 2006) ................................................................. 10

*United States v. Andonian*,
    29 F.3d 1432 (9th Cir. 1994) ................................................................. 10

5

*United States v. Iribe*,
    564 F.3d 1155 (9th Cir. 2009) ................................................................ 10

*United States v. Kin-Hong*,
    110 F.3d 103 (1st Cir. 1997) ................................................................. 28

*United States v. Saccoccia*,
    18 F.3d 795 (9th Cir. 1994) ................................................................... 10

*United States v. Soto-Barraza*,
    947 F.3d 1111 (9th Cir. 2020) ........................................................ 10, 14
    558 F.3d 1049 (9th Cir. 2009) ............................................................... 20

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................. 21, 22, 23

*Wood v. Ostrander*,
    879 F.2d 583 (9th Cir. 1989) ........................................................... 22-23

**Other**

8 C.F.R. § 1208.18 ..................................................................................... 20

8 C.F.R. §§ 208.16 ..................................................................................... 20

22 C.F.R. § 95.1 ........................................................................................ 20

22 C.F.R. § 95.2 ........................................................................................ 19

6

1

2

## **MEMORANDUM OF POINTS & AUTHORITIES**

3

### INTRODUCTION

4

The U.S. government asks the Court to certify the extraditability of Mr. Bryant

5

Rivera so it can send him to Mexico to face two charges of femicide under Article 129

6

of the Baja California criminal code, the first charge relating to the death of Angela

7

Acosta Flores (case no. 7464/2022) in Tijuana, and the second charge relating to the

8

death of Elizabeth Martínez Cigarroa (case no. 1858/2022) also in Tijuana. But such

9

certification is not warranted under the U.S-Mexico extradition treaty (the "Treaty"),[1]

10

would violate that treaty, and would Mr. Rivera's statutory and constitutional rights.

11

*First*. Certification would violate at least two provisions of the Treaty. The Treaty

12

only permits extradition for certain offenses. The government argues that the Treaty

13

covers femicide under Article 129 of the Baja California criminal code because the

14

Appendix to the Treaty includes "murder," and murder is an offense under both Mexican

15

and American law. However, murder and femicide are distinct offenses. And American

16

law does not have an analog to femicide. Femicide is therefore not an extraditable offense

17

under the Treaty. Certification would also violate the rule of specialty—that extradited

18

persons cannot be prosecuted in a requesting country for offenses other than those

19

included in a certification of extradition—because personnel in the prosecuting office in

20

Mexico have already announced their intent to add charges beyond the two that are the

21

subject of these proceedings. In support of these positions, the defense offers declarations

22

from Mexican attorney and professor of criminal law Manuel Alberto Ríos Fernández.

23

*See* Ex. D, Rios Decl. re: Qualifications; Ex. E, Rios Decl. re: Femicide.

24

25

26

[1] Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, as amended by the Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S. Treaty Doc. No. 105-46 (1998), *available at* 1980 WL 309106 (1980).

27

28

7

*Second.* There is not probable cause to believe that Mr. Rivera committed either charged femicide because, as confirmed by Mr. Rios, the government has not submitted evidence showing that Mr. Rivera committed any killing for a "Gender-related" reason as defined by Article 129(II) of the Baja California criminal code. Moreover, for the reasons stated in the concurrently filed motion to suppress evidence, the Court cannot certify extraditability unless the government establishes probable cause without reference to evidence obtained during the unconstitutional search of Mr. Rivera's truck on the day of his arrest. *See* ECF No. 52.

*Third.* As further discussed in the concurrently filed motion for reconsideration of the Court's order denying Mr. Rivera's motion to compel discovery, certification would violate Mr. Rivera's right to procedural due process because he was unconstitutionally denied discovery, in part because of the government's incorrect representations at the hearing on the motion to compel discovery. *See* ECF No. 53.

*Fourth.* Certification would violate Mr. Rivera's rights under the Constitution, Convention Against Torture, and Foreign Affairs Reform and Restructuring Act of 1998, all of which protect him against being extradited Mexico because there is a substantial risk that he will be tortured and face inhumane conditions of confinement there, as evidenced by the U.S. Department of State's own reports on human rights in Mexico and the expert report of Ms. Isabel C. Roby, an attorney who specializes in human rights and has experience with the Mexican criminal justice system. *See* Ex. I, Roby CV; Ex. J, Roby Report.

*Fifth.* The provision of the Treaty permitting extradition of U.S. nationals, like Mr. Rivera, is unconstitutionally vague. There is therefore no valid basis to extradite him in the Treaty.

For all these reasons, the Court should deny the government's request for certification of extraditability.

# ARGUMENT

## I.    Extradition would violate the requirement of dual criminality and the rule of specialty.

Like most extradition agreements, the U.S.-Mexico extradition treaty includes limitations under the doctrines of "dual criminality" and "specialty." *See* Restatement (Third) of Foreign Relations Law §§ 475-76 (explaining that the doctrines are incorporated into most international agreements); *see also United States v. Anderson*, 472 F.3d 662, 665 n.1 (9th Cir. 2006) (doctrines incorporated into extradition treaty); *United States v. Saccoccia*, 18 F.3d 795, 800 (9th Cir. 1994). "Dual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *Anderson*, 472 F.3d at 670 (9th Cir. 2006) (cleaned up). Relatedly, extradition treaties may designate other offenses as eligible for extradition, most often by providing a list of eligible offenses. The Treaty does both, but neither provides an avenue for finding that femicide is an extraditable offence. That aside, "[t]he doctrine of specialty prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *United States v. Andonian*, 29 F.3d 1432, 1434-35 (9th Cir. 1994); *see also United States v. Iribe*, 564 F.3d 1155, 1158 (9th Cir. 2009) (same). The treaty here incorporates both doctrines. And because extradition would not comply with either, the Court should deny certification.

### A.    The U.S.-Mexico extradition treaty does not cover femicide and the dual criminality requirement is not otherwise satisfied.

"The principle of dual criminality does not require that the crimes [of each country] be identical; rather, only the essential character of the acts criminalized by the laws of each country must be the same, and the laws substantially analogous." *United States v. Soto-Barraza*, 947 F.3d 1111, 1117 (9th Cir. 2020) (cleaned up). Article 2(1) of the Treaty incorporates the principle of dual criminality, providing that "[e]xtradition shall

take place, subject to this Treaty, for willful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." The government argues that because the Treaty's appendix includes "murder" and American law prohibits murder, the Treaty covers femicide. But that is not so. As explained below, femicide is defined by Article 129 of the criminal code of Baja California as a separate and distinct from murder under Mexican or American law.[2]

As explained in the declaration of Manuel Alberto Ríos Fernández—a criminal defense attorney and professor of criminal law in Mexicali, Mexico—there are important differences between femicide and homicide. *See* Ex. B, Ríos Decl. re: Femicide.[3] The Treaty's Appendix lists 31 categories of extraditable offenses, including "murder or manslaughter; abortion." *Treaty*, 31 U.S.T. 5059 at p. 10. But conspicuously absent from the list is the crime of femicide, which was not codified in Baja California until 2012 and well after the Treaty's most recent amendment. *Id.*, at 1. The motivating force behind Article 129 was the creation a *new* crime to specifically address the killing of girls and women in the state. *See id.*, at 8-9 (quoting a reform initiative submitted by a state congressperson in Baja California citing the number of killings of girls and women in the region and explaining that Mexico handed down recommendations for changes in the law because of the lack of investigation into cases with female victims).

A deeper look shows murder and femicide do not have the same essential character and are not substantially analogous. To the contrary, the government's comparison of murder and femicide is overly simplistic. Mr. Ríos includes a useful chart in his

---

[2] Note that the government does not claim that dual criminality is satisfied on the alternative basis that femicide is punishable under the federal laws of both countries by deprivation of liberty for at least a year. Gov. Mem., ECF No. 32, at This basis does not apply because femicide is not a crime under American federal law, and the government has not identified and Mexican federal law against femicide.

[3] The term "homicide" as used in Mr. Ríos's declaration covers the crimes of murder and manslaughter.

10

declaration that succinctly highlights the important differences between homicide and femicide under Mexican law:

|  | HOMICIDE | FEMICIDE |
|---|---|---|
| **Provision** | Article 123 of the Penal Code for the State of Baja California. | Article 129 of the Penal Code for the State of Baja California. |
| **Perpetrator.** | Any person, regardless of their gender. | Any person, regardless of their gender. |
| **Victim** | Any person, regardless of their gender. | One or several women. |
| **Objective Element.** | Taking the life of a human being. | Taking the life of a human being, specifically of the female gender. |
| **Subjective Element.** | For the basic crime of homicide, if it is intentional, an element of a subjective nature is not necessary. | Having had the intention of taking of the life of a woman, for reasons of gender exclusively, referred to in Article 129 in its various subdivisions. |
| **Form of the conduct** | Intentional, negligent, or beyond what was intended in a lesser crime. | Only intentional. |

*Id.* at 9-10.

The type of victim and the required intent is significantly different for each offense. While homicide and murder require the taking of any human life, the crime of femicide requires the taking of the life of a woman or girl. When it comes to intent, homicide requires the intentional killing of another human being (or negligence in some forms of manslaughter), but femicide requires the specific intent to take the life of a woman for reasons of gender. *Compare* 18 U.S.C. § 1111(a) ("Murder is the unlawful killing of a human being with malice aforethought.") *and* Cal. Penal Code § 187(a) ("Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.") *with* Article 129 ("The crime of Femicide is committed by whoever intentionally deprives one of various women of life due to Gender-related reasons."). *See* Ex. B, Ríos Decl. re: Femicide, at 7-8.

11

In his declaration, Mr. Ríos cites caselaw from the Mexican courts that further highlight the differences between homicide and femicide. In an opinion from the Supreme Court of Justice of the Nation, addressing the femicide statute in Mexico City, the court explained:

> [W]hen Article 148A [the femicide statute in Mexico City] is classified by legal scholarship, bearing in mind its structure or creation as a special crime—for indeed, it has independence with respect to the basic crime from which it is derived, that is, homicide, since though it shares certain of homicide's essential elements (for example, taking the life of a person), on the other hand, it adds other elements (for example, that said conduct be committed against a woman for reasons of gender)—it becomes an independent legal construct with a specific legal structure, content, and realm of application of its own, and an independent sentencing framework.

*Id.*, at 11.

The same opinion further explained that the different components of homicide and femicide statutes make femicide a wholly different crime:

> [S]uch components make it an independent crime, with a specific legal structure, content, and realm of application of its own and an independent sentencing framework; the difference between the two crimes is even more contrasted given the legal rationale of said special construct, because its creation derives from the response of the Mexican State—in the particular case of domestic legislation—to the clamor and international demand to implement mechanisms to prevent, combat, and

1          punish the growing phenomenon of gender-based "homicides"

2          against women.

*Id.* at 12. Further, as Mr. Ríos explains, "there is an obligation to investigate [the killing of a female] from the start as femicide and apply the protocols and evaluation with a gender perspective." *Id.*, at 13. While this does not shift the burden to the defense to disprove the defendant's intent, as a practical matter it increases the chances that whenever there is a female victim, that the defendant will be charged with femicide.

For these reasons, the offense of "murder" listed in the Appendix to the Treaty is distinct from femicide under Article 129, whether one considers Mexican or American definitions of murder. The must Court therefore deny certification of extraditability.

## B.   Certification would violate the rule of specialty.

The treaty also incorporates the rule of specialty, "which precludes the requesting country from prosecuting a defendant for any offense other than that for which the surrendering country consented to extradite, unless surrendering country approves." *Soto-Barraza*, 947 F.3d at 1116. Article 17(1) of the Treaty states: "A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted nor be extradited by that Party to a third State," absent certain exceptions not applicable here.

The government has requested extradition for the femicides of Ángela Carolina Acosta Flores and Elizabeth Martínez Cigarroa. But media reporting show that prosecutors in Tijuana have likely already indicted Mr. Rivera for femicide against at least one additional victim and will likely add additional charges. As one Associated Press article explains, "Mexican officials have said once Rivera is extradited, they plan to present evidence to add charges for the deaths of two more women in Tijuana, including new evidence found when Rivera was arrested in California." Ex. C,

AP Article.[4] Elsewhere, an in-depth article in the online publication VICE discusses the killing of Karen González Arguelles on August 30, 2020 (before the killings of Flores and Cigarroa) and attributes it to Mr. Rivera. Ex. D, Vice Article.[5] The local news media in Tijuana also repeatedly framed Mr. Rivera as responsible for the murder of three victims, including Arguelles. Ex. E, En Linea Article.[6] Based on these articles discussing Mr. Rivera's case and the prosecuting office's comments about the case, it seems likely that he has already been charged with the femicide of Arguelles. It also seems likely that Mr. Rivera will be (or already has been) charged with other additional femicide counts above and beyond those at issue in the current proceedings.

The rule of specialty does not permit Mr. Rivera to be extradited for any crimes beyond the two outlined in the government's request for certification. But there is no way to reliably certify extradition for only two counts of femicide. Regardless of what this Court certifies, the Mexican government will be free to ignore the rule of specialty and charge Mr. Rivera with additional counts of femicide without any recourse from U.S. courts. As a result, Mr. Rivera's extradition would violate rule of specialty. The Court should therefore decline to certify extradition.

## II. There is not probable cause to believe Mr. Bryant Rivera committed femicide as defined in Article 129 of the criminal code of Baja California.

The government has additionally failed to establish probable cause to believe that Mr. Rivera committed femicide as defined by Article 129, specifically that he killed a

---

[4] *Mexico investigates 4th killing at Tijuana hotel frequented by American accused of killing 3 women*, The Associated Press (Aug. 11, 2023), https://apnews.com/article/tijuana-women-killings-femicides-american-border-dae15a7627e8c8836feb4e2a03cad300

[5] Emily Green, *The Serial Killer Hiding in Plain Sight*, VICE (Sept. 6, 2023), https://www.vice.com/en/article/epv54m/the-serial-killer-hiding-in-plain-sight

[6] *Capturan Al 'Ted Bundy' De Tijuana; Asesinó A 3 Mujeres*, En Linea BC (July 7, 2023), https://www.enlineabc.com.mx/2023/07/07/capturan-al-ted-bundy-de-tijuana-asesino-a-3-mujeres/

14

woman for "Gender-related" reasons. Additionally, for the reasons explained in the concurrently filed motion to suppress evidence, the search of the Mr. Rivera's truck on the day of his arrest was illegal and the Court should not certify extradition unless the government establishes probable cause without reference to the illegally obtained evidence. Mot. to Suppress, ECF No. 52.

**A.    The government has not established probable cause to believe that Mr. Rivera took the life of a woman for "Gender-based reasons" as required by Article 129 of the Baja California criminal code.**

"Probable cause is more than mere suspicion." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994). In the Ninth Circuit, "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." *Id*.

Mexico seeks the extradition of Mr. Rivera based on two charges of femicide under Article 129 of the criminal code for the State of Baja California. Under Article 129, "[w]hoever intentionally takes the life of one or several women for Gender-based reasons commits the crime of femicide." Ex. E, Rios Decl. re: Femicide, at 5. In 2022, when the offenses were allegedly committed, Article 129 defined "Gender-based reasons" to exist if at least one of several circumstances in an enumerated list were present at the time of the killing. *Id*. Relevant here, the government argues for extradition on the charges for both Flores and Cigarroa claiming that, under Article 129(II), gender-based reasons were present because "there existed between RIVERA and each victim a labor and trust relationship . . . namely a client-sex worker relationship." Gov. Mem., at 34.

But a client-sex worker relationship does not satisfy Article 129(II) for reasons explained by Mr. Rios. Article 129(II) provides that there are gender-based reasons if "[t]here has been a labor relationship, educational instructorship relationship, or any other relationship that implies trust, subordination, or superiority between the perpetrator and the victim." Ex. E, Rios Decl. re: Femicide, at 5. Mr. Rios explains that under

Mexican law, "[a] labor relationship is understood when a person, called an employer, contracts a person, called a worker, for the worker to fulfill a work schedule on certain days, where conditions of work are agreed upon, such as wages and vacations, among others." *Id.*, at 15 And Article 20 of the Mexican Federal Labor Act defines "labor relationship" as "the providing of personal work subordinated to a person through the payment of a wage." *Id*. However, "a voluntary agreement between two adult, conscious persons to have sexual relations in exchange for a sum of money in an isolated fashion does not in-and-of-itself imply subordination or superiority." *Id*. Mr. Rios therefore concludes that "it is not correct to assert that, in the case at hand, Bryant Rivera had any labor relationship, educational instructorship relationship, religious relationship, institutional relationship, or any other relationship that implies, formally or de facto, a relationship of subordination or superiority." *Id.*, at 14.

The government has therefore failed to establish probable cause to believe that Mr. Rivera acted with the specific intent required by Article 129(II) and Ninth Circuit law on probable cause. *See Gasho*, 39 F.3d at 1428.

**B.** **The Court cannot consider any evidence seized by the U.S. government from Mr. Rivera's vehicle because it was the product of an illegal search and seizure.**

For the reasons explained in the concurrently filed motion to suppress evidence, the search of the Mr. Rivera's truck on the day of his arrest was illegal. Mot. to Suppress, ECF No. 52. The Court should therefore additionally decline to certify extradition unless the government can establish probable cause without reference to any items illegally taken from Mr. Rivera's vehicle on the day of his arrest. Further, this Court has authority to adjudicate a motion to suppress at this stage, as the Ninth Circuit has approved exclusion of evidence from extradition hearings if the evidence was secured in an unconstitutional manner. *See Santos v. Thomas*, 830 F.3d 987, 1004 (9th Cir. 2016) ("If [inculpatory witness statements] were obtained by coercion in violation of the

principles in the Due Process Clause of the Fifth Amendment, the statements are not competent and cannot support probable cause. In the language of the extradition cases, such statements are not 'contradictory' because the truthfulness of the statements is not the issue.").

**III.    Certification of extradition would violate Mr. Rivera's right to procedural due process because he was unconstitutionally denied discovery, in part because of the government's incorrect representations at the hearing on the motion to compel discovery.**

The Court should additionally deny certification of extradition because Mr. Rivera has been denied procedural due process for the reasons stated in his initial motion to compel discovery and his concurrently filed request for reconsideration of the Court's denial of that motion, ECF No. 53, which demonstrates that the U.S. government conducted its own investigation beyond what was represented at the hearing on the initial motion and has access to evidence beyond the information included in Mexico's extradition request.

**IV.    The Constitution, Convention Against Torture, and Foreign Affairs Reform and Restructuring Act of 1998 prohibit certification of Mr. Rivera's extradition because there is a substantial likelihood that he will be tortured in Mexico.**

Mr. Rivera has constitutional and statutory rights that protect him against being unwillingly being handed over by his own government to a foreign nation where there is a substantial likelihood that he will face torture. These rights arise from the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), the substantive component of the due process clause of the Fifth Amendment, and the equal protection component of the same. Nothing—not separation of power principles or the principle of non-inquiry—prevent the Court from adjudicating

17

these claims now. And the Court should adjudicate these claims now. The U.S. Department of State, the same agency charged with making extradition decisions, has repeatedly and recently recognized "[s]ignificant human rights issues" in Mexico, including "credible reports" of "torture" and "harsh and life-threatening prison conditions." Moreover, as explained in an expert report authored by Isabel C. Roby, an attorney specializing in international human rights, the circumstances of Mr. Rivera's prosecution in Mexico indicate a substantial risk that he will be tortured if extradited.

## A. CAT, FARRA, and the Fifth Amendment prohibit the U.S. government from extraditing its citizens to countries where they are likely to be tortured.

### 1. *CAT and FARRA prohibit extradition when there is a substantial likelihood of torture in the requesting country.*

The United States is party to CAT, which provides in Part 1, Article 3 that, "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Congress codified CAT's prohibition on extradition to nations likely to torture in FARRA § 2242(a), where it declared that it is "the policy of the United States not to . . . extradite . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note. The implementing federal regulations require the Secretary of State to consider the question of whether a person facing extradition from the United States "is more likely than not to be tortured in the State requesting extradition when appropriate in making this determination." 22 C.F.R. § 95.2 (quotations omitted).

FARRA's implementing regulations define torture as "[a]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having

committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 22 C.F.R. § 95.1(b)(1). This definition is substantively identical to the regulations promulgated for purposes of CAT claims in immigration proceedings. *See* 8 C.F.R. § 1208.18(a)(1). Given the similarities between the immigration and FARRA regulations, it is instructive to refer to the substantial CAT jurisprudence developed by the Ninth Circuit in the immigration context.

In the immigration context, federal regulations provide extensive procedural mechanisms for challenging removal based on a risk of torture and federal courts regularly analyze CAT claims. *See* 8 C.F.R. §§ 208.16(c), 208.18; *see also Muradin v. Gonzales*, 494 F.3d 1208, 1210-11 (9th Cir. 2007) (granting CAT relief based on alien's testimony that he had been severely abused and beaten upon being conscripted into the Armenian military and U.S. Department of State reports documenting routine use of torture); *Nuru v. Gonzales*, 404 F.3d 1207 (9th Cir. 2005) (granting CAT relief based on alien's harsh treatment by the Eritrean army due to his political opposition to the war with Sudan warranted CAT relief). The adjudication of these claims often involve the assessment of diplomatic assurances and the justice systems of foreign nations. *See, e.g., Khouzam v. Attorney Gen. of the United States*, 549 F.3d 235, 253 (3d Cir.2008) ("[W]e routinely evaluate the justice systems of other nations in adjudicating petitions for review of removal orders."). Indeed, the Ninth Circuit has held that an adjudicator must consider "the aggregate risk of torture from all sources" when determining the likelihood of torture. *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015). Similarly, "[w]idespread mistreatment of a certain group of people" is probative of the likelihood of torture upon return. *Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009). Detention conditions may also be so clearly deplorable that they support an inference that officials intended the torturous conditions for purposes prohibited by CAT (*i.e.*,

punishment, intimidation, coercion, or discrimination). *Ridore v. Holder*, 696 F.3d 907, 917 (9th Cir. 2012).

> ### 2. The substantive due process component of the Fifth Amendment prohibits extradition where there is a substantial likelihood of torture in the requesting country.

In *Munaf v. Geren*, the U.S. Supreme Court reserved judgment on whether the due process clause of the Fifth Amendment prohibits the government from transferring an American citizen to the custody of a foreign nation where "the probability of torture is well documented, even if the Executive fails to acknowledge it." 553 U.S. 674, 706 (2008) (Souter, J., concurring). Since *Munaf*, neither the Supreme Court, nor the Ninth Circuit, have addressed whether courts considering whether to certify extradition should deny certification pursuant to the Fifth Amendment where a substantial probability of torture has been shown.[7]

The substantive component of the due process of the Fifth Amendment undoubtedly prohibits the U.S. government from sending its citizens to foreign nations where they will likely be tortured. The substantive component of due process prohibits executive action that "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In assessing substantive due process claims, courts are guided by "our Nation's history, legal traditions, and practices." *Washington v. Glucksberg*, 521 U.S. 702, 710 (1997). From the start, the United States has protected its citizens against torture, most notably in the Eighth Amendment's prohibition on cruel and unusual punishment of those convicted of crime. "The American draftsmen, who adopted the English phrasing in drafting the Eighth Amendment, were primarily concerned . . . with proscribing tortures and other barbarous methods of punishment." *Gregg v. Georgia*, 428

---

[7] The Ninth Circuit addressed *Munaf* and the availability of extradition after the Secretary of State has determined that there are not substantial ground for believing relator would be in danger of being tortured, which has not occurred here. *See Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012). To the extent *Trinidad y Garcia* bars review of Mr. Rivera's Fifth Amendment claim, the Ninth Circuit should overrule it.

1  U.S. 153, 169–70 (1976) (cleaned up). All Americans additionally have a right to "bodily
2  integrity," *Glucksberg*, 521 U.S. at 720.

3      Federal detainees who have not been convicted of any crime, like Mr. Rivera, are
4  likewise afforded protections against torture through the Fifth Amendment. *See Caiozzo*
5  *v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] person detained prior to conviction
6  receives protection against mistreatment at the hands of prison officials under the Due
7  Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody
8  . . . ."), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).
9  And federal detainees are not merely protected from torture or other physical abuse at
10  the hands of government agents. Rather, government agents may not act with "deliberate
11  indifference to a substantial risk of serious harm" to detainees, even if that risk comes
12  from non-government agents. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)
13  (cleaned up).

14      In light of these constitutional principles, the Fifth Amendment does not permit
15  the government to act with deliberate indifference to dangers of torture if Mr. Rivera is
16  extradited to Mexico any more than it permits the government act with deliberate
17  indifference to dangers of physical abuse at the hands of other pre-trial detainees at the
18  Metropolitan Detention Center, or permits the government to release him under
19  dangerous conditions. *See Marquez v. C. Rodriguez*, 81 F.4th 1027, 1035 (9th Cir. 2023)
20  (W. Fletcher, J., concurring) (explaining that pre-trial detainee adequately alleged that
21  federal officials failed to protect him from other prisoners, but that the detainee could not
22  recover civil damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau*
23  *of Narcotics*, 403 U.S. 388 (1971), which is not relevant here); *Wood v. Ostrander*, 879
24  F.2d 583, 588 (9th Cir. 1989) (reversing summary judgment in favor of a Washington
25  State Trooper because "the facts put in issue by [plaintiff]—that [defendant] arrested the
26  driver, impounded the car, and left [plaintiff] by the side of the road at night in a high-
27
28
                                                21

crime area show an assertion of government power which . . . tends to show a disregard for [plaintiff's] safety amounting to deliberate indifference.").

### 3. The equal protection component of the Fifth Amendment prohibits extradition where there is a substantial likelihood of torture.

The equal protection component of the Fifth Amendment additionally bars extradition where there is a substantial likelihood of torture. In particular, there is no basis, much less a rational basis, to provide aliens in removal proceedings with judicially administered protections against removal to countries where they are likely to face torture while denying the same protection to American citizens who face extradition.

"The Supreme Court has determined that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. The Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023) (cleaned up). If a government classification "trammels fundamental personal rights or is drawn upon inherently suspect distinctions," the classification is subject to strict scrutiny. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). If not, the classification is subject to either intermediate scrutiny or rational basis review. *See id.*

Here, the Court should apply strict scrutiny to the unequal treatment of citizens in extradition proceedings and aliens in removal proceedings because there are multiple fundamental rights at stake for citizens facing extradition to a foreign nation where they are likely to be tortured. These fundamental rights include: (i) as discussed above, the substantive due process right not to be unwilfully transferred by the U.S. government to a foreign nation where they are likely to be tortured, (ii) the related right to "bodily integrity," *Glucksberg*, 521 U.S. at 720; (iii) the right to be free from government

detention (which will continue for Mr. Rivera if this Court grants certification), *Jones v. United States*, 463 U.S. 354, 361 (1983); and (iv) the right "to remain in this country." *Doe v. Mattis*, 928 F.3d 1, 8 (D.C. Cir. 2019) (cleaned up). "To withstand strict scrutiny a statute must be precisely tailored to serve a compelling state interest." *Hoffman v. United States*, 767 F.2d 1431, 1435 (9th Cir. 1985)

The disparate treatment of citizens facing extradition and aliens facing removal are not precisely tailored to a compelling government interest.[8] As discussed above, federal regulations provide extensive mechanisms for challenging removal based on the potential for torture and courts adjudicating immigration cases regularly consider whether the risk for torture under CAT and FARRA warrants an exception to removal. *Supra* Section V.A.1. In extradition proceedings, however, there is no express regulation or statute permitting the consideration of torture at the certification stage. And, in this case, the government is urging the Court to disregard any "humanitarian" reasons for denying certification.

Yet such disparate treatment does not serve any government interest, much less a compelling one. Both immigration and extradition proceeding involve international affairs, but courts have found that such concerns do not bar courts from assessing the potential for torture or even diplomatic assurances made by foreign nations. *See, e.g.*, *Khouzam*, 549 F.3d at 259 ("Because the Government violated the Due Process Clause by terminating Khouzam's deferral of removal without affording him an opportunity to test the reliability of Egypt's diplomatic assurances, the termination order was invalid."). Determining the likelihood of torture in the immigration and extradition contexts involves essentially the same analysis given their substantively identical definitions of torture. And "[t]here is no reason to think courts would suddenly become less competent in reviewing torture determinations simply because they were made in the context of

---

[8] Nor would they even survive rational basis review.

extradition rather than immigration." *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 1000 (9th Cir. 2012) (Berzon, J., concurring in part and dissenting in part).

For these reasons, neither concerns about court entanglement with international relations, nor purported difficulties in assessing the potential for torture, justify providing aliens, but not American citizens, with judicial protections against their unwilling transfer to foreign nations where they are likely to be tortured. *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (A government classification violates equal protection when the relationship between a classification and its goal is "so attenuated as to render the distinction arbitrary or irrational.").

## B.    The Court can consider the likelihood of torture at this stage.

Citing the principle of non-inquiry, the government urges the Court to disregard any "humanitarian" arguments that Mr. Rivera might raise. But the Court can and must consider the likelihood of torture at this stage. Such consideration is permitted required by the Fifth Amendment and not barred by the non-inquiry rule.

### 1.    *Due process requires consideration of torture.*

Both the procedural and equal protection components of due process give Mr. Rivera the right to have his torture claim considered by this Court at this stage of proceedings. As already discussed, equal protection principles dictate that persons in extradition proceedings should not be transferred to countries where they are likely to face torture, just as persons in immigration proceedings should not be transferred to such countries. *See supra Section* VI.A.3. The same reasoning supports the conclusion that, just like persons in immigration proceedings, persons in extradition proceedings should be granted the procedural protection of a neutral court's evaluation of their torture claim.

Principles of procedural due process require the same result. "[T]he judiciary must ensure that the constitutional rights of individuals subject to extradition are observed." *Valenzuela*, 286 F.3d at 1229 (reversing certification of extradition because magistrate relied on evidence procured by government in violation of relator's due process rights);

see also *Santos*, 830 F.3d 987 (same); *Demjanjuk*, 10 F.3d 338 (same). Among those rights is the Fifth Amendment's guarantee of procedural due process. "The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotations omitted).

In evaluating the sufficiency of procedures under the due process clause, courts apply the three-part balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Mathews* requires a court to (1) consider the private interest affected by the challenged actions; (2) evaluate the risk of erroneous deprivation of rights under the challenged procedures and the value, if any, of additional safeguards; and (3) balance the government's interest, taking into consideration the function involved and the burden imposed by additional safeguards. *Id.*, 335.

Here, Mr. Rivera's interests and the incredible danger he may face in Mexico outweigh any government interests in extraditing him. Mr. Rivera has the most important personal interests and constitutional rights at stake. If extradited, he may face painful torture and even extrajudicial killing. *See Munaf*, 553 U.S. at 700 ("Such allegations [of potential torture] are of course a matter of serious concern . . . ."); *Trinidad y Garcia*, 683 F.3d at 998 (Berzon, J., concurring in part and dissenting in part) ("[T]he consequence of error—torture—is indisputably significant, indistinguishable in terms of magnitude of harm, I would suggest, from indefinite detention."). This implicates his constitutional rights, including the right not to be condemned to such a fate by his own government, his right to bodily autonomy, his right to be from government detention (which will continue if this Court grants certification), and his right to remain in this country. *See supra* Section VI.A.2.

On the other hand, Courts have found that concerns about judicial interference with executive functions, like international relations and warmaking, do not outweigh important individual interests similar to those at stake for Mr. Rivera. For example, there

are extensive procedural safeguards available to persons deemed "enemy combatants," as established in cases like *Boumediene v. Bush* 553 U.S. 723 (2008). In *Boumediene*, the Supreme Court affirmed that alleged enemy combatants are entitled to challenge their detention through judicial review, underscoring the importance of due process even in the context of a national security. *Id.*, 798. Furthermore, *Hamdi v. Rumsfeld* held that citizens detained by the U.S. military for allegedly acting as enemy combatants had the due process right to "a meaningful opportunity to contest the factual basis for that detention before a neutral decisionmaker." 542 U.S. 507, 509 (2004) (plurality). The Court reasoned that the right to be free from government detention "is the most elemental of liberty interests." *Id.*, 529. Similarly, as discussed at length above, judicial determinations of torture are already being provided to persons in removal proceedings. Mr. Rivera is not seeking anything more than that. The enemy-combatant and immigration contexts illustrate that separation of powers principles do not require this Court to disregard the potential that Mr. Rivera will be tortured. To the contrary, "[w]hatever power the United States Constitution envisions for the executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id.*, 536.

## 2. *The rule of non-inquiry does prevent consideration of torture at this stage.*

Citing the non-inquiry principle, the government urges the Court to disregard any "humanitarian" considerations touching on conditions that Mr. Rivera might face in Mexico. The Court should reject this argument because Mr. Rivera has numerous constitutional rights at stake, all of which trump any common law rule of non inquiry.[9] Moreover, "[t]he Supreme Court has never used the term 'rule of non-inquiry,' let alone

---

[9] As already discussed, the Constitution does not vest the executive with some freewheeling extradition power; any extradition authority must come from treaty or statute. *Valentine*, 299 U.S. at 8–9.

26

explicated its scope or proper application." *Trinidad y Garcias*, 683 F.3d at 992 (Berzon, J., concurring in part and dissenting in part); *see also, id*. ("There is no constitutional or statutory command establishing a rule of non-inquiry—that is, a rule precluding any substantive judicial inquiry into the likely fate of extradited criminal defendants.").

While non-inquiry encourages deference to the executive's assessment of foreign justice systems, it is not an absolute restraint on the courts. *See United States v. Kin-Hong*, 110 F.3d 103, 112 (1st Cir. 1997) ("[N]one of these principles, including non-inquiry, may be regarded as an absolute."). Courts have acknowledged that an exception to the rule may exist when extradition would expose an individual to "procedures or punishment . . . antipathetic to a federal court's sense of decency[.]" *Gallina v. Fraser*, 278 F.2d 77, 79 (2nd Cir. 1960); *see also Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir. 1999) (assuming existence of humanitarian exception but declining invoke based on facts of case); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326–27 (9th Cir.1997) (same); *Arnbjornsdottir–Mendler v. U.S.*, 721 F.2d 679, 683 (9th Cir. 1983) (same); *Khouzam*, 549 F.3d at 253–54 ("Furthermore, we have expressly reserved the possibility that, even in the extradition  on context, the rule of non-inquiry would not apply if an alien raises a CAT claim."). The unique evidence of Mr. Rivera's likely torture in Mexico, further discussed below, far surpass claims of potential torture in prior cases where courts have not been required to reach the question of whether a humanitarian exception to extradition. *See infra* Section IV.C. This includes the government's cited case of *Prasoprat v. Benov*, which cites various Ninth Circuit decisions noting the possibility of a humanitarian exception to the non-inquiry rule and does not categorically reject the possibility of an exception. 421 F.3d 1009 (9th Cir. 2005).[10]

---

[10] To the extent *Prasoprat* bars consideration of Mr. Rivera's torture claim, the Ninth Circuit should overrule it.

**C.    There is a substantial likelihood that Mr. Rivera will be tortured if he is extradited to Mexico.**

Reaching the merits of Mr. Rivera's torture claim, there is no doubt that extradition would expose Mr. Rivera to a risk of torture that would violate his rights under the Fifth Amendment, CAT, and FARRA, as evidenced by the State Department's own reports on human rights abuses in Mexico and the expert report of Ms. Isabel C. Roby.

> *1.    The U.S. Department of State has repeatedly recognized that Mexico faces "significant human rights issues"—including "torture" and "harsh and life-threatening prison conditions."*

The U.S. Department of State—headed by the U.S. Secretary of State who will decide whether to extradite Mr. Rivera if the Court grants certification—has repeatedly published reports detailing significant human rights issues in Mexico, including credible reports of torture and harsh and life-threatening prison conditions.

In 2023, for example, the State Department acknowledged the extensive complaints of torture, including against Mexican state attorney general's offices, despite federal laws prohibiting torture:

> Federal law prohibited torture or cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court. Despite these prohibitions, there were reports that security forces tortured detainees.
>
> Civil society groups reported torture was a generalized practice. In 2022, the Mexican Commission for the Defense and Promotion of Human Rights stated that human rights organizations received approximately 9,500 complaints for torture and inhuman treatment. Victims most often accused

1           municipal police, public security, and state attorney general's

2           offices of torture or inhuman treatment.

3           . . .

4           Impunity for torture was prevalent among the security forces.

5           Nongovernmental organizations (NGOs) stated that authorities

6           failed to investigate torture allegations adequately.

7 Ex. F, 2023 Human Rights Rpt., at 8. The State Department reported similarly in both

8 2022 and 2021. *See* Ex. G, 2022 Human Rights Rpt., at 1 ("Significant human rights

9 issues included credible reports of . . . torture or cruel, inhuman, degrading treatment or

10 punishment by security forces . . . harsh and life-threatening prison conditions . . . .").;

11 Ex. H, 2021 Human Rights Rpt., at 1 (same).  And beyond torture, the State Department

12 has consistently reported that "abusive physical conditions" in Mexican prisons and

13 detention centers. Ex. F, 2023 Human Rights Rpt., at 9-11; *see also* Ex. G, 2022 Human

14 Rights Rpt., at 8-9; Ex. H, 2021 Human Rights Rpt., at 8-9.

15         The Court should not ignore the State Department's repeated acknowledgment of

16 the use of torture and inhuman conditions of confinement in Mexico. Indeed, the Ninth

17 Circuit has relied on such reports in reversing determinations made in immigration

18 proceedings that an alien have not shown a substantial risk of torture under CAT. *See,*

19 *e.g.*, *Muradin*, 494 F.3d at 1211 ("[T]he State Department's report makes clear that

20 torture of conscripts, prisoners, and deserters is likely. We therefore grant Muradin's

21 petition for review and hold that substantial evidence supports Muradin's eligibility for

22 CAT relief."). These reports similarly demonstrate the dangers that Mr. Rivera will face

23 if extradited.

24

25

26

27

28

**2.**    ***As explained in Ms. Isabel C. Roby's expert report, there is a
substantial likelihood that Mr. Rivera will be tortured in
Mexico given the specific circumstances of his prosecution.***

In light of the State Department's consistent reporting of torture and human rights
violations in Mexico, the defense retained Ms. Isabel C. Roby to assess whether
Mr. Rivera is likely to be tortured if extradited to Mexico. *See* Ex. I, Roby CV; Ex. J,
Roby Rpt. Ms. Roby is an attorney at the Robert F. Kennedy Human Rights organization
who has experience with the Mexican criminal justice system. Ex. I, Roby CV; Ex. J,
Roby Rpt., ¶5-8. Her report confirms the findings of the State Department regarding the
general prevalence of torture and inhumane conditions of confinement in Mexico, but
also addresses the risks faced by Mr. Rivera given the specific circumstances of his
prosecution, including the substantial publicity and public outcry regarding his case,
public statements by the prosecuting office, and Mr. Rivera's certain pre-trial detention
at facilities with long histories of abusive practices. Ex. J, Roby Rpt. ¶¶73-82.

**a.**    **Mexico's criminal justice system suffers from the
systemic use of torture.**

Torture is widespread in Mexico. According to local organizations, , human rights
commissions have received over 9,000 complaints of torture or mistreatment since 2019,
with most victims directly accusing state authorities. Ex. J, Roby Rpt. ¶22. Legislative
attempts to prohibit torture have been ineffective because of the complete impunity its
perpetrators receive, with over 99 percent of cases remaining unresolved, and a policy of
concealing torture through poorly conducted forensic examinations. *Id*. Torture is
particularly common in initial moments of detention, whether for the purposes of
punishment or extracting confessions. *Id*., ¶25. The most common methods of torture are
punches and kicks, blows with weapons and other objects, crushing of limbs and other
parts of the body, asphyxiation, electric shocks, and threats to victims and their families.
*Id*., ¶23. Particularly serious is the incidence of sexual abuses,  including forced nudity,

violence against sexual organs (blows, electric shocks, crushing, cuts, or the insertion of objects), sexual harassment. *Id*.

Additionally, 66 percent of imprisoned men reported having been victims of psychological torture during the transfer between their arrest and initial contact with judicial authorities;[11] 42 percent of imprisoned individuals interviewed reported that they were personnel associated with prosecuting offices beat or mistreat them to induce incriminating statements; 22 percent suffered similar treatment during efforts elicit incriminating information about others; and 20 percent of individuals reported confessing because of physical assaults. *Id*., ¶ 25

        **b.**    **The risk of torture is elevated because Mr. Rivera's faces a high-profile prosecution in which the prosecuting office has publicly likened him to Ted Bundy and promised to bring additional charges not included in the request for extradition.**

Representatives from the office prosecuting Mr. Rivera in Tijuana, including Ricardo Iván Carpio Sánchez, have made inflammatory public statements about the prosecutoin, including: (i) that Mr. Rivera displayed "violent and psychopathic behavior," (ii) "If someone threatens the lives of our citizens, of our women, then they will have a serious problem with our justice system," and (iii) comparing Mr. Rivera to notorious serial killer Ted Bundy. Ex. J, Roby Rpt. ¶73. The statements have been widely reported in Mexican and American media. *Id*. Such media coverage has additionally prompted public demonstrations where demonstrators walked with banners depicting Mr. Rivera's name and likeness, while chanting justice for Angie (referencing Ms. Flore). *Id*. Publicity, whether it comes from the prosecutor's office itself, the media, or

---

[11] According to United Nation Special Rapporteur on Torture, "psychological torture" includes "all methods, techniques and circumstances which are intended or designed to purposefully inflict severe mental pain or suffering without using the conduit or effect of severe physical pain or suffering." Ex. J, Roby Rpt. ¶28.

activists, puts political and professional pressure on personnel in the prosecuting office to secure convictions against Mr. Rivera at all costs. *Id*. This pressure is additionally problematic because the prosecuting office has announced that it is investigating Mr. Rivera for four femicides, even though Mexico's extradition request only applies to the killings of Flores and Cigarroa. *Id*., ¶ 74. Potential convictions on four femicide charges, instead of two, put additional political and professional pressure on prosecutors to secure convictions through improper means, as the alternative would leave the prosecuting office with two unsolved, but widely discussed, femicides. *Id*.

Given Mexico's documented widespread use of torture for investigatory purposes, Mr. Rivera faces a substantial risk of being subjected to such methods to extract evidence or a confession linking him to crimes beyond those cited in the extradition request. The risk is heightened by the fact that Mexican authorities have expressed an interest in pursuing additional charges, suggesting a motive to obtain further confessions by any means necessary. This potential for torture and coercion to produce evidence or confessions raises serious human rights concerns and questions about the reliability of any evidence obtained under such conditions. Therefore, the extradition of Mr. Rivera to Mexico must be carefully scrutinized to ensure that it does not result in severe violations of his fundamental rights.

      c.    **The risk of torture is elevated because Mr. Rivera will be subject to mandatory pre-trial detention in one of Tijauna's various detention centers with histories of human rights abuses.**

Because Mr. Rivera is accused of committing these offenses in Tijuana, Baja California, he will likely be detained at CERESO HONGO II or CERESO EL HONGO ("El Hongo"), which house pre-trial detainees whose charges originate from Tijuana. *Id*. Torture has been and is still a recurring problem at El Hongo. *Id*. In 2020, the directors of El Hongo were dismissed because of the systematic use of torture. *Id.* The former

Ombudsman in the state of Baja California confirmed in an interview with Ms. Roby that incidents of beatings, torture, cruel and inhumane treatment of visiting relatives of prisoners, and arbitrary control over food and medication are constantly reported in the penitentiary centers of Baja California, including El Hongo. *Id*. These occurrences are not isolated incidents but systematic across nearby prisons. *Id*. Because Mr. Rivera is charged with femicide, pre-trial detention is mandatory. *Id*., ¶76. There is additionally a relationship between the risk of torture and the duration of confinement: risk increases as confinement drags on. *Id*., ¶78.

In Mexico, the use of torture to coerce confessions is compounded by the widespread and excessive use of pretrial detention. *Id*., ¶ 78. As already explained, there is a direct relationship between the risk of torture and the length of time an individual spends in prison. *Id*.

*       *       *

The Court should not disregard the substantial risk of Torture that Mr. Rivera will face if extradited to Mexico, a risk that is confirmed in the State Department's own reports and further confirmed by Ms. Isabel Roby.

## V.    The provision of the U.S.-Mexico treaty permitting extradition of U.S. nationals—like Mr. Rivera—is void for vagueness.

Finally, the Court should deny certification because the provision of the U.S.-Mexico treaty permitting extradition of U.S. nationals—like Mr. Rivera—is void for vagueness under the due process clause of the Fifth Amendment.

As a threshold matter, it is important to start with the well-established proposition that the Constitution does *not* vest the executive with freewheeling authority to extradite American citizens to foreign nations, but instead requires a grant of authority pursuant statute approved by the legislature or a treaty approved by the Senate:

> [The power to extradite] is not confided to the Executive in the absence of treaty or legislative provision. At the very beginning,

33

Mr. Jefferson, as Secretary of State, advised the President: "*The laws of the United States, like those of England, receive every fugitive, and no authority has been given to their Executives to deliver them up.*" As stated by John Bassett Moore in his treaties on Extradition—summarizing the precedents— "the general opinion has been, and practice has been in accordance with it, that *in the absence of a conventional or legislative provision, there is no authority vested in any department of the government to seize a fugitive criminal and surrender him to a foreign power*." Counsel for the petitioners do not challenge the soundness of this general opinion and practice. It rests upon the fundamental consideration that *the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must be authorized by law.* There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given by act of Congress or by the terms of a treaty, it is not enough that statute or treaty does not deny the power to surrender. It must be found that statute or treaty confers the power.

*Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 8–9 (1936); *see also Munaf v. Geren*, 553 U.S. 674, 704 (2008) (citing *Valentine* with approval); *Trinidad y Garcias*, 683 F.3d at 992 (Berzon, J., concurring in part and dissenting in part)("There is no constitutional or statutory command establishing a rule of non-inquiry—that is, a rule precluding any substantive judicial inquiry into the likely fate of extradited criminal defendants.").

34

While the Constitution does not grant the executive freewheeling extradition powers, the due process clause of the Fifth Amendment's void-for-vagueness doctrine prohibits the government from "taking away someone's life, liberty, or property" pursuant to a law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This prohibition applies to both statutes and treaties because "there is no doubt that the power to make treaties is circumscribed by substantive provisions of the Constitution, and that the courts are competent to pass on the constitutionality of treaties." *In re Aircrash In Bali*, 684 F.2d 1301, 1308–09 (9th Cir. 1982). And though the void-for-vagueness doctrine appears frequently in the criminal context, is also applies in the civil context, including in removal proceedings governed by federal immigration statutes. *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018). Indeed, the Supreme Court "long ago held that the most exacting vagueness standard should apply in removal cases" because of the "grave nature of deportation." *Id*, 595-97.

All this compels the conclusion that the provision of the U.S.-Mexico treaty permitting extradition of U.S. nationals is void for vagueness. First, like removal proceedings, extradition involves important interests and constitutional rights subject to due process protections including the void-for-vagueness doctrine. These include the substantive due process right not to be unwilfully transferred by the U.S. government to a foreign nation where they are likely to be tortured, the right to bodily integrity, the right to be free from government detention, and the right to remain in this country. *See supra* Section IV.A.2. Second, the relevant provision of the U.S.-Mexico treaty is impermissibly vague under Supreme Court precedent. It provides that the executive may extradite an American if "it be deemed proper to do so" without further elaboration or guidance:

> Neither Contracting Party shall be bound to deliver up its own
> nationals, but the executive authority of the requested Party shall,

if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so. Article 9. Federal statutes governing extradition provide no further guidance on when it is "proper" for the executive to exercise the extradition power. *See* 18 U.S.C. §§ ("If on such hearing, [the magistrate] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . . he shall certify the same . . . that a warrant may issue . . . for the surrender of such person, *according to the stipulations of the treaty or convention . . . .*") (emphasis added); 3186 ("The Secretary of State *may* order the person committed under sections 3184 or 3185 of this title to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged.") (emphasis added).

Such an indeterminate and arbitrary standard for exercising the extradition power—whenever the executive deems extradition "proper"—is plainly unconstitutional under Supreme Court precedent. *See, e.g.*, *Dimaya*, 584 U.S. 148 (holding unconstitutionally vague a residual clause in an immigration statute rendering aliens subject to removal if they have a prior conviction for "any . . . felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; *Johnson*, 576 U.S. 591 (holding unconstitutionally vague a residual clause in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)); *Kolender v. Lawson*, 461 U.S. 352 (1983) (holding unconstitutionally vague a state law requirement that suspects of crime provide a "credible and reliable" form of identification).

## CONCLUSION

For the stated reasons, the Court should deny the government's request to certify the extradition of Mr. Rivera, ECF No. 32.

Respectfully submitted,

36

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  July 16, 2024          By   /s/ J. Alejandro Barrientos

J. ALEJANDRO BARRIENTOS
HOWARD SHNEIDER
Deputy Federal Public Defenders
Attorneys for Bryant Rivera

37

## <u>CERTIFICATION</u>

This memorandum contains 9,046 words, as permitted in the Court's prior order permitting memorandum of no more than 10,000 words.


/s/J. Alejandro Barrientos