**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| IN THE MATTER OF THE EXTRADITION OF BRYANT RIVERA | ) | NO.  2:23-CV-08153-MWC-KS |
|---|---|---|
| A Fugitive from the Government of Mexico. | ) ) ) ) ) ) ) ) | CERTIFICATION OF EXTRADITABILITY |

**BACKGROUND**

The Government of Mexico has requested the extradition of Bryant Rivera ("Rivera"). Rivera opposes extradition.

On June 29, 2023, the Government of the United States ("Government") filed a "Complaint for Provisional Arrest With A View Toward Extradition" pursuant to 18 U.S.C. section 3184 "In the Matter of the Extradition of Bryant Rivera, also known as 'Eduardo'" (hereinafter "Rivera") in case number 23-mj-03275.  Extradition is sought pursuant to the Extradition Treaty between the United States of America and the United Mexican States, 31 U.S.T. 5059, as amended by the Protocol to the Extradition Treaty Between the United

1

States of America and the United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S. Treaty Doc. No. 105-46 (1998) (collectively, the "Treaty), with respect to Rivera. (*See* Complaint, Exhibit 1 in case no. 23-mj-0375 (dkt. no. 1).) On June 29, 2023, based on probable cause, the Treaty, the provisional arrest request, and 18 U.S.C. § 3184, the court issued a warrant for the arrest of Rivera. Rivera was arrested in this District on July 6, 2023 and made an initial appearance. (Case no. 23-mj-0375, dkt. no. 5.) At the initial appearance, the Court ordered temporary detention pending a hearing pursuant to the Bail Reform Act. (Case No. 23-mj-0375, dkt. no. 13.) On July 10, 2023, the undersigned United States Magistrate Judge held a detention hearing and ordered Rivera permanently detained pending extradition proceedings. (Case No. 23-mj-0375, dkt. no. 16.)

On September 28, 2023, the criminal filings in the matter entitled "In the Matter of the Extradition of Bryant Rivera, A Fugitive from the Government of the United Mexican States," (case no. 23-mj-0375), were consolidated with the instant Civil Case No. 2:23-cv-8153-MCS-KS and the matter was referred to the undersigned United States Magistrate Judge for decision. (Dkt. No. 26.) On the same date, September 28, 2023, the Government filed its "Request for Extradition" and related Exhibits. (Dkt. No. 25.) On October 2, 2023, the Honorable Mark C. Scarsi referred this matter to the undersigned U.S. Magistrate Judge for decision pursuant to 18. U.S.C. § 3184. (Dkt. No. 31.)

On October 19, 2023, the Government filed its Extradition Memorandum. (Dkt. No. 32.) On October 27, 2023, Rivera filed a Notice of Motion and Motion for Order to Compel Discovery and related Exhibits ("Motion to Compel"). (Dkt. No. 33.) On November 12, 2024, this matter was transferred from District Judge Mark C. Scarsi to the calendar of District Judge Michelle Williams Court for all further proceedings. (Dkt. No. 66.) On November 16, 2023, the Government filed an Opposition to Rivera's Motion to Compel and Rivera filed a Reply on November 26, 2023. (Dkt. Nos. 36, 37.) On December 7, 2023, the

Court heard oral argument on the Motion to Compel and took the matter under submission. (Dkt. No. 40.)

On January 31, 2024, the Court denied Rivera's Motion to Compel. (Dkt. No. 46.) On February 5, 2024, the parties filed a Stipulation and Proposed Order to Reschedule the Extradition Hearing and relating briefing. (Dkt. No. 49.) On February 6, 2024, the Court granted the Stipulation and rescheduled the extradition hearing for June 27, 2024. (Dkt. No. 48.) On April 25, 2024, Rivera filed a stipulation to continue the extradition hearing from June 27, 2024 to August 27, 2024. (Dkt. No. 49.) The Court granted Rivera's stipulation on April 25, 2024. (Dkt. No. 50.)

On July 16, 2024, Rivera filed a Motion to Suppress Evidence (dkt. no. 52) and a Motion for Reconsideration of the Court's Order Denying Defendant's Motion to Compel Discovery (dkt. no. 53). On July 29, 2024, the parties submitted a Joint Stipulation to continue the extradition hearing from August 27, 2024 to October 1, 2024 (dkt. no. 55) and the Court granted the Joint Stipulation on the same date (dkt. no. 56).

On September 10, 2024, the Government filed its Oppositions to the Motion to Suppress Evidence and to Rivera's Motion for Reconsideration. (Dkt. No. 57.) Also on September 10, 2024, the Government filed its Reply in Support the Request for Certification of Extraditability, along with a Declaration of John J. Lulejian and related exhibits. (Dkt. No. 59.) Defendant filed a Reply brief in support of his Motion to Suppress Evidence and in support of the Motion for Reconsideration. (Dkt. No. 59.) On October 1, 2024, the Court held a hearing on Rivera's Motion to Suppress Evidence, the Motion for Reconsideration, and Plaintiff's Request for Extradition. (Dkt. No. 61.)

After hearing oral argument and witness testimony from the Government's witness, FBI Special Agent Cinthia Gutierrez, the Court denied the Motion to Suppress Evidence.

(*Id.*)  The Court also heard oral argument and took the Motion for Reconsideration under submission.  (*Id.*)  On the same date, the Court heard oral argument on the Request for Extradition and took the matter under submission.  (*Id.*)  On November 26, 2024, the Court denied Defendant's Motion for Reconsideration.  (Dkt. No. 69.)

The Request for Extradition is now fully briefed and under submission for decision without further oral argument.

### FINDINGS AND CONCLUSIONS RE: EXTRADITION

**I.      Jurisdiction**

This Court has subject matter jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. section 3184, Local Rule 72-1, and General Order No. 05-07 of the United States District Court for the Central District of California, which specifically delegates to magistrate judges in this District the authority to handle extradition proceedings.  The Court has personal jurisdiction over Rivera pursuant to 18 U.S.C. section 3184 because Rivera was "found" in this district when he was arrested in Los Angeles County on the extradition warrant on July 6, 2023.  (Case No. 23-mj-0375, dkt. no. 5.)  *See also In re Extradition of Emilio Valdez Mainero,* 990 F. Supp. 1208, 1216 (S.D. Cal. 1997) (hereafter "*Mainero*").  Rivera does not challenge this issue.

**II.     Treaty**

The Treaty is in full force and effect.  United States' Extradition Memorandum, Exhibit A, ("Treaty").  (Dkt. No. 24-1 at pp. 49-65 (sealed).)  The State Department's determination that the Treaty is in full force and effect is entitled to deference.  *Then v.*

4

*Melendez*, 92 F.3d 851, 853 (9th Cir. 1996); *Mainero,* 990 F. Supp. at 1217 (internal citations omitted).

### III.   Identity

Bryant Rivera, a United States citizen, also known as "Eduardo", admitted his true name at his initial appearance and has not denied that he is the person named in the extradition request and charged in Mexico.[1]  (United States' Extradition Memorandum at 1; *and see* Opposition ("Opp'n") at 7.)  Thus, the Court readily concludes that the person appearing before this Court is the same Bryant Rivera sought by the Government of Mexico.

### IV.   Request for Extradition; Procedural Requirements

The Request for Extradition filed with this Court by the Government of Mexico, as augmented by subsequent filings, complies with the procedural requirements of the Treaty. Rivera offers no evidence or argument to challenge that this procedural requirement has been satisfied.

### V.   Charges

Rivera is sought in Mexico pursuant to warrants issued by a Mexican court to face two charges of femicide, also referred to as feminicide, as outlined in and penalized by Articles 14(II), 16(I), 114, 114 bis, and 129(II) and (VI) of the Criminal Code of the State of Baja California, Mexico (the "Baja Criminal Code").  (Request for Extradition, Dkt. No. 24-2 at 18-20.)  The first charge relates to the homicide of Angela Carolina Acosta Flores ("Acosta

---

[1]   There is no legal bar precluding extradition of a United States citizen to a foreign country.  *Charlton v. Kelly*, 229 U.S. 447, 467 (1913); *and see Mainero*, 990 F. Supp. at 1227-28 (finding probable cause for extradition of U.S. citizen to Mexico on homicide charges).

Flores"), a sex worker (case no. 7464-2022) in Tijuana on or about January 24, 2022, and the second charge relates to the homicide of sex worker Elizabeth Martinez Cigarroa ("Cigarroa") (case no. 1858/2022), also in Tijuana, on or about February 17, 2022. (*Id.* [Dkt. No. 24-2 at 11-12]).

**VI.     The Charges Against Rivera Under Mexican Law**

The criminal case involving the death of Acosta Flores (criminal case no. 7464/2022) alleges Rivera's probable responsibility for committing the crime of Feminicide, established and sanctioned by Article 129, section II of the Penal Code for the State of Baja California, while the criminal case involving the death of Cigarroa (criminal case no. 1858/2022) is brought under Article 129 sections II and VI, which provide as follows:

> FEMINICIDE: The crime of femicide is committed by anyone who intentionally deprives one or more women of their lives for gender-related reasons. It is considered that there are gender reasons when one or more of the following circumstances are present:
> …
> II. – An employment, academic, or any other relationship that implies trust, subordination or superiority between the perpetrator and the victim; . . .
> …
> VI.     The victim's corpse is disposed of in a public place.
> …
> Whoever commits the crime of femicide shall be sentenced to a prison term of thirty-five to sixty years in prison, and a fine of two hundred to two thousand times the daily value of the Current Measurement and Updating Unit.
> …"

(Dkt. No. 24-1 (Arrest Warrant) at 6.) In addition, the Baja Penal Code provides that "the criminal offense of 'femicide' requires that the murder of a woman be committed for 'reasons of gender,' which requires that the following elements be met:

1) The murder of one or more women;

2) Committed intentionally; and

6

3)  For reasons of gender.

(*Id.*)

## VII.   Dual Criminality

The doctrine of "dual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the law of both the surrendering and requesting nations." *Clary v. Gregg*, 138 F.3d 764 765 (9th Cir. 1998) (citing *United States Saccoccia*, 18 F.3d 795, 800 n.6 (9th Cir. 1994)).  "Dual criminality exists if the 'essential character' of the acts criminalized by the laws of each country are the same and the laws are 'substantially analogous.'" *Manta v. Chertoff*, 518 F.3d 1134, 1141 (9th Cir. 2008).

Here, the doctrine is incorporated into Article 2 of the Treaty between the United States and Mexico, which provides that the requested Party shall grant extradition of "persons who the competent authorities of the requesting Party have charged with an offense committed outside the territory of the requesting Party if: . . . its laws would provide for the punishment of such an offense committed in similar circumstances[.]"  (Treaty,  Article I, TIAS 9656  at 5061 [Dkt. No. 24-1, Ex. 1 at 24].)  Article II of the Treaty states:

> Extradition *shall* take place, subject to this Treaty, for willful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year.

(Treaty Article 2.1, TIAS 9656 at 5062 (emphasis added) [Dkt. No. 24-1 at 25].)

The scope of liability and the name by which the crime is described in the requesting and surrendering countries need not be the same.  *Manta,* 518 F.3d at 1141.  Further, "the

7

elements of the crime allegedly committed in a foreign country also need not be identical to the elements of the substantially analogous crime." *Id.* (internal citations omitted). In determining whether dual criminality exists, the Court must consider "the totality of the conduct alleged." *Man-Seok Choe v. Torres*, 525 F.3d 733, 737 (9th Cir. 2008), *cert. denied*, 555 U.S. 1139 (2009) (citation and internal quotations omitted). In other words, to support extradition, this Court must determine whether, based on the evidence, the accused could be brought to trial for the same crime in the United States.

Here, Bryant is sought by Mexico for alleged "femicide," which, as noted above, under Mexican law is defined as the "killing of a woman," "committed intentionally," for reasons of gender." (Dkt. No. 24-1 (Arrest Warrant) at pp. 6-7.) In opposing extradition, Bryant argues that the crime of "femicide" is not punishable under both the Treaty and California law and therefore extradition would violate the requirement of dual criminality and the rule of specialty. (Opp'n at 9-10.)

But Rivera himself quotes controlling authority in this Circuit that undermines his argument that dual criminality is not present here. In the Opposition brief, Rivera cites *United States v. Soto-Barraza*, 947 F.3d 1111 (9th Cir. 2020), where the Ninth Circuit explained "[t]hat the principle of dual criminality does not require that the crime [of each country] be identical; rather, only the essential character of the acts criminalized by the laws of each country must be the same, and the laws substantially analogous." (Opp'n at 9 (citing *Soto-Barraza*, 947 F.3d at 1117).)

Here, as the United States emphasized in its briefing and at the extradition hearing, the "essential character" of the two crimes at issue here – femicide and homicide – are not dissimilar. Although the United States does not have a crime entitled "femicide," which is criminal in Mexico as outlined in the Treaty, "homicide," is criminal under laws of the United States and, while not uniquely focused on the intentional killing of a woman because of her

gender, homicide is a broader category of unlawful killing of a human being, which would encompass the crime of femicide as recognized under Mexican law.   Moreover, the acts alleged here concerning Rivera's involvement in the deaths of Acosta Flores and Cigarroa would, if proven, be punishable as homicide in the United States under 18 U.S.C. § 1111[2] or under California law as a violation of California Penal Code § 187.[3]  *See Matter of Juarez*, Case No. 1:24-mj-00079-SAB, 2025 WL 776081 at * 4 (E.D. Cal. Mar. 11, 2025) (finding "femicide is an extraditable offense covered under [U.S.-Mexico]Treaty.") Thus, the dual criminality requirement is satisfied here as well.

## VIII.  Limited Nature of Extradition Proceedings

The Ninth Circuit has emphasized the very limited role of the court in extradition proceedings:

> An extradition court – in this case the magistrate judge – exercises very limited authority in the overall process of extradition.  As we have explained, "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function" [citations omitted]. Extradition from the United States is initiated when the nation seeking extradition makes a request directly to the State Department [citation]. "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney  . . . files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." [citation]. Upon the filing of a complaint, a judicial officer (typically a

---

[2]    18 U.S.C. Section 1111 defines "murder" as the unlawful killing of a human being with malice aforethought.

[3]    California Penal Code section 187(a) defines "murder" as "the unlawful killing of a human being or fetus with malice aforethought."

magistrate judge) issues a warrant for an individual sought for extradition, provided that an extradition treaty exists between the United States and the country seeking extradition and the crime charged is covered by the treaty. 18 U.S.C. § 3184. After the warrant issues, the judicial officer conducts a hearing to determine whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," *id.*, or, in other words, whether there is probable cause.

*Vo v. Benov*, 447 F.3d 1235, 1937 (9th Cir.), *cert. denied*, 549 U.S. 935 (2006).

Because of the limited nature of the proceedings, the person whose extradition is sought is not entitled to all of the rights available to a defendant in a criminal trial in the United States.   *See Neely v. Henkel*, 180 U.S. 109, 122 (1901); *In the Matter of the Extradition of Smyth,* 61 F.3d 711, 720-21 (9th Cir. 1995).   Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings.   *See* Fed. R. Crim. P. 1(a)(5) (rules not applicable to "extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) (except for rules on privilege, evidence rules "do not apply to . . . extradition or rendition").

In determining whether the crime is extraditable and whether probable cause exists, the Magistrate Judge "has no discretionary decision to make."   *Prosoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005), *cert. denied*, 546 U.S. 1171 (2006) (citations and internal quotations omitted).   "If the judge or magistrate judge concludes that 'the crime is extraditable,' and that 'there is probable cause to sustain the charge,' the judge or magistrate judge must certify the extradition."   *Manta*, 518 F.3d at 1140 (internal citation omitted). "Once a magistrate judge confirms that an individual is extraditable, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive."

*Blaxland v. Commonwealth Director of Public Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003).

## IX. Admissibility Issues

In an extradition proceeding, the accused is not entitled to introduce evidence that goes to his defense, but he may offer limited evidence to explain elements in the case against him that would negate a finding of probable cause. *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005). Further, hearsay statements are competent evidence to support extradition. *Emami v. U.S. Dist. Court for Northern District of California*, 834 F.2d 1444, 1451 (9th Cir. 1987); *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y. 1973), *aff'd sub nom. In re Christensen*, 478 F.2d 1392 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay."). Documents may be received and admitted as evidence if they are "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." 18 U.S.C. § 3190.

Here, the affidavits, numerous witness statements, and certifications of various surveillance camera footage submitted in support of the Request for Extradition, have been legally authenticated and the translations certified. Accordingly, these documents and other evidence, as summarized below, are received into evidence.

## X. The Evidence Presented

In support of the request for Rivera's extradition in connection with the Acosta Flores and Cigarroa killings, the government has submitted a compendium of evidence in both cases that includes English translations of the Arrest Warrants in criminal case 74464/2022 (Acosta Flores) and criminal case 1858/2022 (Cigarroa) issued by the Office of the Attorney General

11

of the State of Baja California that includes  discussions of the applicable statute of limitations in each case, along with a detailed summary of evidence indicating Rivera's involvement in the violent deaths of Acosta Flores and Ciggaroa.  (*See* Dkt. Nos. 25-2, 25-3 (sealed).)

The evidence provided with the extradition request includes translations of the certified law enforcement investigation files from Baja California, postmortem photographs of Acosta Flores taken at Hotel Cascadas in the room where her body was found – the same room Rivera was known to have checked into with Acosta Flores.  The evidence supporting Bryant's probable involvement in the death of Cigarroa similarly includes translations of the Arrest Warrant, a discussion of the applicable statute of limitations, translations of sworn witness affidavits, autopsy reports, expert opinions, telephone records, and postmortem photographs showing Cigarroa's naked body as it was found in the trunk of her vehicle hours after Cigarroa told friends she was meeting Rivera and was seen on surveillance video leaving a restaurant with Rivera.  The evidence provided with the Request for Extradition as to the death of Acosta Flores and Cigarroa is substantial and graphic.  A summary of this evidence is outlined below.

### a.   Death of Acosta Flores and Investigation (Case 7464/2022)

In criminal case 74464/2022 regarding the death of Acosta Flores, the Government submitted translated statements given in Spanish to Mexican authorities by Clara Romelia Acosta Flores Córdovo ("Acosta Flores Córdova"), the mother of Acosta Flores, on January 28, 2022.  (Dkt. No. 25-1 at 35.)  In her statement to the authorities of the Office of the Prosecutor General of the State of Baja California, Acosta Flores Córdova recounted that her daughter started to work at the "Hong Kong" bar in 2021 as a dancer and sometimes as a sex worker.  (Dkt. No. 24-2 at 11.)  The last time Acosta Flores Córdova contacted her daughter was on January 24, 2022, when at around 22:12 p.m., Acosta Flores texted her mother that

she was going to room 404 at Hotel "Cascadas," located next to the "Hong Kong" bar, for 30 minutes with a client. (*Id.*) At 22:45 p.m., Acosta Flores Córdova, messaged her daughter, but got no answer and later tried Acosta Flores's cell phone, which went directly to voicemail. (*Id.* at 12.) Acosta Flores Córdova subsequently contacted Acosta Flores's boyfriend to assist with locating Acosta Flores, and one of the women at the "Hong Kong" bar told the boyfriend that she had seen Acosta Flores with a client who she knew to be Bryant Rivera, described as a male, about 1.70 m tall, dark-skinned with pockmarked face and that he was a "gringo." (*Id.*)

Later that evening, when Acosta Flores Córdova and Acosta Flores's boyfriend went to a reception at Hotel "Cascadas" sometime after midnight, they were told that Acosta Flores had been found dead in room 404. (*Id.*) On February 2, 2022, Acosta Flores Córdova identified Acosta Flores's body at the facilities of the Forensic Medical Service of the Office of the Prosecutor General of the State of Baja California. (*Id.*) The Medical Examiner who performed an autopsy on Acosta Flores noted that her body showed blunt force injuries to the head, fractures to hyoid bone and laryngeal cartilage, hemorrhaging in her pelvic cavity, and that she was suffocated by paper pushed through her oral cavity and strangulation. (*Id.* at 13.)

Another woman who worked as a sex worker at the "Hong Kong" bar was interviewed on February 8, 2022. (*Id.* at 13.) She stated that Rivera, for whom this witness had previously provided sex services, arrived at the "Hong Kong" bar on January 24, 2022. (*Id.*) She reported that Rivera had previously told her that he was an American and lived in California and he sometimes used the name "Eduardo" when checking in at the hotel. (*Id.*) The woman noted that Rivera was about 1.70 m tall, between 27 and 30 years of age, had light brown skin, short dark hair and had an acne scarred face with a mole to the left of his nose." (*Id.*) The woman also reported that she saw Rivera leave with Acosta Flores for Hotel "Cascadas" around 10 p.m. on January 24, 2022. (*Id.*)

13

Two employees of Hotel "Cascadas" were interviewed about the events of January 24-25, 2022.  One employee stated that the rooms at Hotel Cascadas are frequently used by clients and women who work at the "Hong Kong" bar as sex workers and on January 24, 2022, a male checked in under the name "Eduardo," paid for a room until 13:00 January 25, 2022, and was given room 404.  When this witness learned the next day that the body of a dead female had been found in room 404, the witness stated that he had seen the male individual who registered at "Eduardo" with Acosta Flores.  The witness described Rivera as having light brown skin, regular build, short brown hair, wide forehead, medium eyes, sparse eyebrows, acne-scarred face a mole to the left side of his nose, and that he was about 1.7 m tall and between 30-35 years of age.  (*Id.* at 14.)  When the hotel supervisor reviewed the hotel's security cameras for January 24, 2022, he stated "he had seen the male individual who was with the woman found dead in room 404 because he was a regular client."  (*Id.* at 15.)  Moreover, at an identification procedure on March 10, 2022, the supervisor viewed a photo array and "recognized [Rivera] as the person who, on January 24, 2022 checked in as 'Eduardo' and was assigned room 404 and hours later he was with [Acosta Flores]."  (*Id.*)

An Object Inspection Record dated February 24, 2022, that is part of the investigation file, includes a USB device that contained a videorecording showing the arrival of the victim [Acosta Flores] at the hotel with a male individual and both entered room 404 where [Acosta Flores] was found dead.  (*Id.*)  The video recording shows that between 22:11 on January 24, 2022, and 11:35 on January 25, 2022, no one other than Rivera and the Acosta Flores is seen entering the room, and no one other than Rivera is seen leaving the room.  (*Id.* at 16.)  The video footage purportedly shows Acosta Flores and Rivera enter Hotel "Cascadas" together at 22:11 on January 24, 2022, and walk to the elevator; at 22:12 Acosta Flores and Rivera get out of the elevator on the fourth floor and enter room 404 at 22:13; at 23:49 Rivera exits room 404 alone and leaves the fourth floor by the stairs.  (*Id.* at 16.)  On January 25, 2022, hotel staff enter room 404 and find Acosta Flores naked and dead.  (*Id.*)

14

An official letter from the United States Department of Homeland Security, dated March 4, 2022, informed the Office of the Prosecutor General for the State of Baja California that it had located a record of Rivera entering the United States, crossing on foot from Tijuana to San to San Ysidro on February 24, 2022, and showing Rivera taking a 13-minute walk from Hotel "Cascadas" to the border. (*Id.* at 16 (citing Ex. 16).) According to records contained in the investigation file, the video of Rivera crossing into the United States on January 25, 2022 shows him wearing the same clothes he was wearing on February 24, 2022 as he was leaving Hotel "Cascadas" and was captured on the hotel's security cameras. (*Id.* (citing Ex. 17).)

In March 2022, the San Diego Police Department, in response to a request by the Office of the Prosecutor General for the State of Baja California, provided a photograph of Rivera, along with his ID number his residence address, and two vehicle reports in Rivera's name. (*Id.* (citing Ex. 18.)

In July 2023, the Federal Bureau of Investigation conducted a judicially-authorized search of Rivera's residence and vehicle "pursuant to a request under the Mutual Legal Assistance Treaty between the United Mexican States and the United States of America." (*Id.* at 17.) The search resulted in the seizure of:

- a receipt from Hotel "Cascadas" in Tijuana B.C. Mexico dated 1/24/2022 for room 404;
- a golden card with the moniker "Hong Kong Gentlemen's Club, VIP Gold" and bearing the name of Rivera;
- a Untied States of America passport issued in the name of Rivera and a photograph of the person whose extradition is sought, and that was "used for the identification procedures conducted by the witnesses."

(*Id.* at 18 (citing Ex. 19).)

15

**b.  Death of Cigarroa and Investigation (Case 1858/2022)**

On March 16, 2022, the Constitutional Rights Judge of the Judicial Branch for the State of Baja California, located in Tijuana, Mexico, issued an arrest warrant for Rivera for his probable involvement in the death of Cigarroa, another young woman who worked as a sex worker at the "Hong Kong" bar, whose body was found approximately three weeks after Acosta Flores's murder.  (Dkt. No. 24-2 at 18.)  The evidence presented by Mexican authorities indicating Rivera's probable involvement in Cigarroa's homicide is similarly specific and substantial as that in the Acosta Flores murder.

On February 17, 2022, the Office of the Prosecutor General for the State of Baja California was notified of an abandoned white 2008 Jeep liberty vehicle.  (*Id.* at 20.)  When authorities arrived on the scene, they were met by a woman who indicated that the vehicle belonged to her friend, Elizabeth, who had been missing for several days.  (*Id.*)  When authorities inspected the inside of the vehicle, in the back of the trunk they found a "female person, naked, lying in a fetal position."  (*Id*.)  The victim's brother arrived on the scene and confirmed that the vehicle belonged to his sister and that the female corpse found in the vehicle was Cigarroa.  (*Id.* at 21.)  Cigarroa's mother later identified the body as that of her daughter and provided an original birth certificate to confirm their relatedness.  (*Id.*)  An autopsy found that "remains of napkin or toilette-type paper were found in the trachea and these were soaked with blood."  (*Id*. at 22.)  The autopsy indicated that Cigarroa had been dead more than 36 hours and the cause of death was "anoxemia due to strangulation."  (*Id.* (citing Ex. 7).)  The injuries to Cigarroa's "body and face [were] similar to those of Acosta Flores, as well as paper in her trachea."  (*Id.* at 20.)

Cigarroa's mother later told authorities in an interview that her daughter engaged in prostitution and that she worked at the "Hong Kong" bar.  The mother indicated that on February 15, 2022, Cigarroa told her mother that she was going to meet a client and this was

later confirmed by Cigarroa's brother who told police that his sister had texted him that she was going to pick up a client and "specified the place and the name of the motel she would be at, because she distrusted the individual, because he seemed weird." (*Id.*)  The mother stated that, on the evening of February 15, 2022, when she had not heard from her daughter she began to worry and "sent messages to the victim [Cigarroa] without receiving [any] reply" and "called [Cigarroa's] telephone but the call went to voicemail." (*Id.*)

On February 16, 2022, the mother and Cigarroa's brother accessed Cigarroa's telephone account to determine Cigarroa's last locations and went looking for Cigarroa in those places but were unable to find her. (*Id.*)  Cigarroa's mother contacted, Nuñez Vega, a friend of Cigarroa who also worked at the "Hong Kong" bar. (*Id.*)  On February 17, 2022, Nuñez Vega called Cigarroa's mother to report that she had found Cigarroa's car parked near the "Hong Kong" bar. (*Id.* at 23.)  Cigarroa's brother told authorities that on February 15, 2022,  he had received a "WhatsApp" message from Cigarroa in which Cigarroa wrote:

> I will go out with a client to a motel.  It is called hacienda soler, at 1:30 I will pick him up at the line.  I will let you know what motel it is because he says we will go there, but I don't know if there is something special about that motel.  I hope everything goes well, brother.

(*Id.*)  Cigarroa's brother provided authorities with information obtained from screenshots of Cigarroa's calls and text messages from her iCloud account.  Mexican authorities with requested international legal assistance were able to confirm that between February 11 and 17, 2022, Cigarroa had several records from a number ending in digits 17-42 that was registered to a Carla Jimenez at an address in Lomita California. (*Id.* at 24.)

Nuñez Vega reported to authorities that she had worked as a sex worker for four years at the "Hong Kong" bar in Tijuana, Baja California, where, on January 24, 2022, one of her

17

friends introduced her to Rivera, who bought drinks for several women and 20 minutes later left the bar with Cigarroa. (*Id.*)  Nuñez Vega reported that the next day, January 25, 2022, she learned from other girls at the bar that a woman had been found dead in a room at Hotel "Cascadas."  Nuñez Vega also said that on January 24, 2022, Cigarroa had told her that she had seen Rivera and Acosta Flores walking up to Hotel "Cascadas." (*Id.*)  Nuñez Vega stated that, sometime around February 13, 2022, Cigarroa told Nuñez Vega that she was going to go out with her client, Rivera, who had bought them drinks a few days before.  Nuñez Vega recalled Rivera as "around 25 to 30 years old, medium to robust build, light brown complexion, wide forehead, short black hair, around 1.70 meters tall" and his face distinguished by acne[] scars."  Nunez was confident she could "identify [Rivera] without fear of being mistaken because he was a client of her friend [Cigarroa]." (*Id.* (citing Ex. 12).)

Mexican authorities interviewed another woman, López Campos, who also worked at the "Hong Kong" bar with Nuñez Vega. (*Id.* at 25.)  López Campos stated that she had worked for five years as a sex worker in the "Hong Kong" bar and she was at the table on January 24, 2022 around 17:00 hours when Rivera bought the women drinks. (*Id.*)  López Campos recalled that about 20 minutes later Acosta Flores and Rivera left the bar heading toward Hotel "Cascadas," which is located "in the same address as bar 'Hong Kong.'" (*Id.*)  The next day, Lopes Campos learned that Acosta Flores had been found dead in one of the rooms at Hotel "Cascadas." (*Id.*)  On February 13, 2022, Cigarroa told López Campos and Nuñez Vega that Cigarroa was going to go out with Rivera and Cigarroa, told her friends that Rivera "would pay her five thousand pesos for four hours of service, and that he would take her to Motel 'Hacienda el Soler.'" (*Id.* at 26.)  Lopez Campos's description of Rivera was nearly identical to the description that Nuñez Vega provided: "around 25 to 30 years old, medium to robust build, light brown complexion, wide forehead, short black hair, around 1.70 meters tall," with acne scars as a distinguishing mark on his face. (*Id.*)  Subsequently, Nuñez Vega and López Campos each independently recognized Rivera in a photo array "without fear of being mistaken." (*Id.*)

18

As part of their investigation, Baja authorities obtained video from security cameras in the places known to have been visited by Cigarroa and Rivera on February 15, 2022.  (*Id.*)  The video evidence showed that:

- around 14:46 a white Jeep Liberty entered the parking lot entrance to restaurant "Mr. Pampas" where Cigarroa is seen exiting the vehicle on the driver's side.  Rivera exited from the passenger's side and both entered the restaurant;
- at 14:56 Cigarroa and Rivera are seen sitting in the restaurant and remained there for more than an hour;
- at 16:01 Cigarroa and Rivera go to the restaurant exit;
- at 16:05, Cigarroa and Rivera are seen waiting in the restaurant parking lot for the valet parking service to deliver the white Jeep Liberty; Cigarroa gets in the driver's seat and Rivera in the passenger seat; the vehicle starts and heads down Boulevard Sanchez Tabaoada, Tijuana, Baja California.

(*Id.* at 27.)

Mexican authorities also obtained video recordings from Motel Hacienda el Soler that appear to show:

- at 16:54 a while Jeep Liberty passes the motel and enters the property;
- at 16:56 Cigarroa exits the white Jeep Liberty to pay and then boards the vehicle again; the vehicle enters the garage of one of the rooms of the Motel; and
- about two hours later, the while Jeep Liberty exits the Motel "Hacienda el Soler" and drives on Calle Libramiento Sur, Tijuana, Baja California.

(*Id.* (citing Ex. 17).)  Based on the security video obtained from other nearby establishments, Mexican authorities confirmed the white Jeep's movements from Motel "Hacienda el Soler"

19

on February 15, 2022 and confirmed that the woman who paid at the Motel and then entered the motel had the same clothing (blue Levis jacket, white blouse, blue Levis pants, light colored tennis shoes, light blue face mask) and physical characteristics of the female who had earlier entered the Pampas restaurant with Rivera. (*Id.* at 29.)

At around 18:45 hours on February 15, 2022, the white Jeep Liberty is shown driving on Avenida Internationale, then takes Calle Niños Héroes, Colonia Zona Norte Delegación Zona Center. (*Id.* at 28 (citing Ex. 18).) Shortly thereafter, an individual matching Rivera's description is seen walking on Calle Niños Héroes. (*Id.*) At 19:09 hours, the same person "wearing sport pants in dark color and light gray color sweatshirt with hood on and face mask" is seen on video security camera "crossing Calle Coahuila, Colonia Zona Norte." (*Id.*) Shortly after, the same individual is seen approaching a cab site at Calle Coahuila Colonia Zona Norte, where he boarded a taxi-type vehicle. (*Id.*) At 19:17 hours, Rivera is seen getting out of the taxi-type vehicle and walking towards "the crosswalk of the international border at San Ysidro California, United States of America." (*Id.* (*citing* Ex. 21).)

Mexican authorities showed Nuñez Vega video images collected from February 15, 2022 and she identified "the female wearing a blue levis jacket, blue levis pants, light color shoes" in the "Mr. Pampas" restaurant and at the entrance of Motel "Hacienda el Soler" as Cigarroa, and the male appearing with Cigarroa, who was wearing dark sports pants, a light gray sweatshirt with hood, black tennis shoes and a black face mask, as Rivera. (*Id.* (*citing* Ex. 23).) Nuñez Vega also recognized the white Jeep Liberty in the video recordings to be the vehicle owned by Martinez Cigarroa. (*Id.*) Mexican authorities interviewed Ricardo Lamas Aguilera, who stated that on February 15, 2022 at around 19:00 hours, he was working as a taxi driver at the taxi stand located on Calle Coahuila, Colonia Zona Norte, Tijuana, Baja California and, while he was working, "a male customer with an American accent approached requesting service to the San Ysidro line." (*Id.* at 30 (citing Ex. 24).) Mr. Aguilera described that male as being of regular build, wearing dark sports pants, a light gray color hooded

sweatshirt, and a black face mask. (*Id*.) The United States Department of Homeland Security, in response to an official letter from Mexican authorities dated March 4, 2022, reported to Baja California authorities that a search of its archives/data base found records of Bryant Rivera entering the United States of America on foot from Tijuana to San Ysidro on February 15, 2022 at 19:24 hours. (*Id.* (citing Ex. 25.)

In March 2022, the San Diego, California Police Department, at the request of Baja California authorities, provided a photograph, identification number, domicile and two vehicle reports under the name of "Bryant Rivera." (*Id.* at 31 (*citing* Ex. 27).) U.S. authorities later turned over to Mexican authorities various objects obtained during an authorized search of Rivera's home. (*Id.*)

Based on all of the information and documentation obtained in its investigation, and pursuant to the provision of Article 10 of the Extradition Treaty between the United States of America and the United Mexican States, Mexican authorities concluded that "there is suitable and sufficient evidence to establish that Bryant Rivera . . . is the person who deprived Angela Carolina Acosta Flores and Elizabeth Martinez Cigarroa of life." (*Id*. at 32.)

### XI.    Probable Cause Determination

"An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial." *Emanmi v. United States District Court for the Northern District of California*, 834 F.2d at 1452. "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (internal citations and quotations omitted). An extradition proceeding thus "makes no determination of guilt or innocence," but is "designed only to trigger the start

of criminal proceedings against an accused," and "guilt remains to be determined in the courts of the demanding country." *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009), *cert. denied*, 560 U.S. 958 (2010) (citation and internal quotations omitted). The country seeking extradition need not produce all of its evidence, and the Magistrate Judge does not determine whether there exists sufficient evidence to convict. *Id.* at 717; *Quinn v. Robinson*, 783 F.2d 776, 815 n.41 (9th Cir.) *cert. denied*, 479 U.S. 882 (1986) (noting well established rule that extradition proceedings are "not to be converted into a dress rehearsal for a trial") (citation and internal quotations omitted). "[T]he magistrate's function is to determine whether there is any evidence sufficient to establish reasonable or probable cause." *Sainez*, 588 F.3d at 717 (citation omitted).

## XII.    Probable Cause is Established

Rivera maintains that there is not probable cause to believe that he committed the killing of a woman for "gender-related reasons" as defined in Article 129 of the Baja California criminal code. (Opp'n. at 15.) However, as detailed above, the information presented by Mexican authorities from their investigation demonstrates ample evidence that Rivera sought the services of known sex-workers Acosta Flores and Cigarroa. Both women told friends and/or family members that Rivera was a "client." This evidence is sufficient to establish a relationship of labor and trust between the victims and Rivera, i.e., that of a client-sex-worker relationship. Both women were found dead, both killed by strangulation shortly after being seen with Rivera.

\\

\\

\\

\\

\\

22

## XIII.  Rivera's Challenges to the Extradition Request Fail

### a.  The Dual Criminality Requirement is Satisfied

Despite an abundance of verified evidence gathered by Mexican law enforcement and prosecutorial authorities suggesting Rivera's involvement in the deaths of Acosta Flores and Cigarroa, Rivera opposes extradition on multiple grounds.  (Opp'n, Dkt. No. 54.)  The Court considers each of those grounds below.

Rivera argues that certification would violate the requirement of dual criminality because the U.S.-Mexico extradition treaty does not cover the crime of "femicide."  (Oppo at 9-12.)  But as discussed above, U.S. law does cover the crime of homicide, which is the intentional killing of another human being, male or female. *Infra* at 7-9.  Nevertheless, Rivera presents a declaration of Manual Alberto Rios Fernandez ("Rios Decl."), a criminal defense lawyer and professor of criminal law in Mexicali, Mexico, in which Professor Rios staunchly rejects the notion that the crime of femicide can be analyzed as a subset of "homicide."  (*Id*. at 10.)  Professor Rios avers that while the Treaty lists "murder or manslaughter; abortion" as extraditable offenses, it does not list the crime of femicide, which was not codified in Baja California until 2012, well after the Treaty's most recent amendment.  (Opp'n at 10; *and see* Rios Decl. (dkt. no. 54-5) at 8.)

Indeed, the language of the Mexican statute sets forth elements of the crime of "femicide" that are not elements of murder or homicide as codified in the United States, including the requirement that there be "gender-based reasons" surrounding the killing of a woman.  (*Id*.)  However, Rivera concedes, as he must, that "[t]he principle of dual criminality does not require that the crimes [of each country] be identical; rather, only that the essential character of the acts criminalized by the laws of each country must be the same, and the laws substantially analogous."  (Opp'n at 9 (citing *United States v. Soto-Barraza*, 947 F.3d 1111,

23

1117 (9th Cir. 2020).)   Rivera argues that "murder and femicide do not have the same essential character and are not substantially analogous."  (Opp'n at 10.)   However, Rivera cannot plausibly establish that, with a showing of the requisite *mens rea*, the killing of a woman or female child would not be considered a "homicide" or "murder" – a crime punishable under the laws of both the United States and Mexico – even if a killing of a boy or man could not be punished as "femicide" under Mexican law.  Indeed, the very opinion of the Supreme Court of Justice of the Nation, cited by Mr. Rios, stated that the purpose of the femicide statute was "to punish . . . *gender-based 'homicides'* against women."  (Opp'n at 12-13.)   Thus, femicide is a more specific subset of "homicide, but "homicide" nonetheless.

Mr. Rios, Rivera's expert, argues that the crime of "femicide" has not been established by the evidence because a "Labor relationship" requires a finding that an employer contracts with a person to "fulfill a work schedule on certain days, with agreed upon conditions of work." (Opp'n at 16.)   Rios further argues that a "voluntary agreement among adults to have sex in exchange for money" does not in-and-of itself imply subordination or superiority.  (*Id.* (*citing* Barrios Decl., at 15).)   But Mr. Rios's argument misses the mark.  His thesis assumes that sex work conforms to a traditional employer-worker commercial labor model.  Not so.  As established by the evidence presented here by Mexican authorities and witness statements of other sex workers who knew Acosta Flores and Cigarroa, their working relationships did not operate on a 9-to-5 schedule with fixed working parameters and conditions.  Rather, Acosta Flores and Cigarroa both appear to have selected their own "clients," and chose their working locations.  Finally, as noted above, courts who have addressed this very issue in extradition proceedings have concluded that homicide under U.S. laws and femicide under Mexico law satisfy the dual criminality requirement. (*See infra* at 8-9.)

\\

\\

\\

24

### b. The Rule of Specialty Does Not Apply in this Proceeding

Rivera also argues that extradition would violate the Rule of Specialty, a principle that "precludes the requesting country from prosecuting a defendant for any offense other than that for which the surrendering country consented to extradite, unless surrendering country approves." (Opp'n at 13 (*citing United States v. Soto-Barraza*, 947 F.3d 1111, 1116 (9th Cir. 2020)).) Specifically, "[t]he Rule of Specialty prohibits a requesting nation from prosecuting an extradited individual for any offense other than that for which the surrendering state agreed to extradite." *United States v. Van Cauwenberghe*, 827 F.2d 424, 428 (9th Cir. 1987).

Rivera argues that granting extradition would violate this rule because Mexican authorities have stated an intention to add further charges beyond the two charges involving the murders of Acosta Flores and Cigarroa. (Opp'n at 13.) Rivera, pointing to reports in the media, asserts that certification must be denied because "prosecutors in Tijuana have likely already indicted Mr. Rivera for femicide against at least one additional victim and will likely add additional charges." (*Id.*) The United States responds that Rivera's argument is not ripe because any such additional charges would not be entered until Rivera appears in Mexico following extradition. (Reply at 8-9.)

More importantly, "the doctrine is based on principles of international comity, and its protections exist only to the extent that the surrendering country wishes." *United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir. 1986), *cert. denied*, 479 U.S. 1009 (1986). Therefore, the application of the Rule of Specialty rests entirely with the Secretary of State, who has ultimate responsibility for surrendering a defendant, and not with this certifying court. Indeed, Rivera does not have standing to assert any violation of the Rule of Specialty because, at this time, there is no evidence that Rivera faces any additional charges beyond those associated with the deaths of Acosta Flores and Cigarroa. (Reply at 9.) And as courts in this Circuit have emphasized, should a violation of the Rule of Specialty occur *after*

Rivera's extradition, the Secretary of State would have the responsibility to enforce the Treaty provisions based on the Rule of Specialty. *See In re Extradition of Handonovic*, 829 F.Supp.2d 979, 991 (D. Or. 2011) (citing *United States v. Najohn*, 785 F.2d 1420, 1422) (9th Cir. 1986)).

### c.  Rivera's Due Process Argument Fails

Rivera also argues that certification of extradition should be denied on the ground that "certification would violate Mr. Rivera's right to procedural due process because he was unconstitutionally denied discovery." (Opp'n at 9.)  Rivera maintains that the Court cannot consider evidence seized by the U.S. government from Mr. Rivera's vehicle because that evidence was the product of an illegal search and seizure. (Opp'n at 16-17.)  Rivera's due process arguments also fail.

On January 31, 2024, following briefing and a full hearing, the Court denied Rivera's motion to compel discovery in a written order. (Dkt. No. 46.)  Rivera sought reconsideration of that Order (dkt. no. 53), and on November 26, 2024, following full briefing and a hearing, the Court denied Rivera's motion for reconsideration. (Dkt. No. 69.)

The only purpose of an extradition proceeding "is for the magistrate judge to determine whether the crime is extraditable and whether there is probable cause to support the charge." *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005).  If the magistrate judge concludes that the crime is extraditable and probable cause supports the charge, the magistrate judge *must* certify the individual as extraditable to the Secretary of State." *Id.* (emphasis in original, internal citation omitted).  "An extradition proceeding is not a trial," *id.* (citing *Emami v. United States Dist. Court*, 834 F.2d 1444, 1452 (9th Cir. 1987)).  Thus, because of the narrow nature of the magistrate judge's role in an extradition proceeding, "the accused does not have a constitutional right to discovery." *Kollmar v. United States Pretrial*

26

*Services, Northern Dist. Of California*, 642 F. Supp. 3d 982, 996 (N.D. Cal. 2022). Moreover, an accused may not offer evidence to contradict the evidence offered by the government. *Id.* (citing *Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016)). In light of the court's narrow function in this extradition proceeding, Rivera's argument that he was unconstitutionally denied discovery must fail.

Consequently, the Court finds no basis to reverse its earlier decision denying Rivera's request to compel discovery from the United States government.

### d. Rivera's Humanitarian and Due Process Arguments Fail

Rivera contends that the extradition request should be denied because it would violate his "rights under the Constitution, Convention Against Torture, and Foreign Affairs Reform and Restructuring Act of 1998," because he maintains that "there is a substantial risk that he will be tortured and face inhumane conditions of confinement" if extradited to Mexico. (*Id.*) But Rivera's humanitarian argument is not supported by the relevant case law and overlooks the limited nature of the certification proceeding. As the United States emphasizes, to accept Rivera's argument would require this Court "to exceed its limited role in the extradition process." (Reply at 15.)

Under the principle of "non-inquiry" the Secretary of State, not the courts, generally determines whether the United States should refuse to extradite an individual for humanitarian reason. *Prasoprat*, 421 F.3d at 1016 (collecting cases). Rivera argues that this Court "can and must consider the likelihood of torture at this stage." (Opp'n at 24.) But Rivera cites no decisional authority that undermines or challenges the well-settled principle of non-inquiry. (*Id.*) Indeed, as a Magistrate Judge in this district recently explained in response to similar arguments regarding possible torture of an individual subject to extradition, even if the Court had discretion to refuse to certify extradition based on humanitarian concerns, "the Ninth Circuit has made clear that a magistrate judge may not

27

invoke it." *Matter of extradition of Ahn*, 602 F. Supp. 3d 1304, 1320 (C.D. Cal. May 9, 2022) (citing *Prosoprat,* 421 F.3d at 1017 ("the magistrate judge did not have the authority to refuse to issue a certificate of extradition on humanitarian grounds.").

The Convention Against Torture ("CAT") entered into force for the United States in November 1994. (*Id.* n.9.) Article 3 of the convention provides, in relevant part, that "[n]o State Party shall expel, return . . . or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." (*Id.* (citing U.S. Dep't of State, Treaty in Force (2020); 22 C.F.R. §95.1(a); *see* Lulejian Decl. ¶ 2, Exh. E).) The CAT cannot, of itself, provide a basis to bar certification of extradition because the document is not self-executing and does not create any enforceable rights in U.S. courts. *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011) (noting as to CAT, Article 3, "[t]his multilateral treaty is non-self-executing and does not itself create any rights enforceable in U.S. courts." (internal citation omitted)). Moreover, as the Fourth Circuit has emphasized, the implementing legislation for CAT precludes a district court from exercising jurisdiction over such claims except in cases involving a final order of removal in immigration cases. *See Mironescu v. Costner,* 480 F.3d 664, 674 (4th Cir. 2007). As the United States argues, Rivera's challenge to extradition based on CAT runs counter to an extensive body of case law in which district courts have consistently declined to review similar claims. (Reply at 16 (collecting cases).)

Finally, even if Rivera's CAT claim were subject to judicial review, the claim is premature because the Secretary of State has not yet considered Rivera's case and "Rivera will not be extradited if the Secretary determines that torture is likely." (*Id*. at 17.) Thus, the final determination whether Rivera should be surrendered rests with the Secretary of State, not this Court. *Prasoprat*, 421 F.3d at 1016 ("Once the magistrate judge determines that the crime is extraditable and there is probable cause to sustain the charge, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive."

(internal citation omitted)).  Therefore, Rivera's claim that the CAT bars extradition in this matter is not before this Court.

Rivera also argues that his Fifth Amendment rights of due process will be violated due to the "substantial likelihood" that he may suffer torture in Mexico.  (Opp'n a 24-33.)  Rivera contends that "procedural and equal protection components of due process" afford Rivera the right to have this Court consider his torture claim considered at this certification stage of these proceedings.  (Opp'n at 24.)  This argument also fails.  As emphasized by the United States, in an extradition proceeding, while a fugitive has certain due process rights, an individual subject to extradition is not entitled to the full panoply of due process protections.  (Reply at 18-19 (citing *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980).)  Indeed, courts have emphasized that in the extradition context, due process requirements are satisfied by an extradition hearing under 18 U.S.C. § 3184, and through habeas review.  *Escobedo*, 623 F. 2d at 1105.

The enemy combatant cases that Rivera relies upon do not compel a different result.  (Opp'n at 25-26.)  In *Boumediene v. Bush*, 553 U.S. 723 (2008); *Hamdi v. Rumsfield*, 542 U.S. 507 (2004); and *Dhiab v. Bush*, No. 05-1457 (GK), 2008 WL 4905489, *1 (D.D.C. Nov. 12, 2008), the courts were concerned with the Government's factual and legal justification(s), for identifying the petitioners as "enemy combatants" without any involvement of the independent judiciary.  In fact, in *Hamdi*, the Court held that "a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification."  *Hamdi*, 542 U.S. at 533; *and see Dhiab v. Bush*, 2008 WL 49095489 at *1 (ordering government to file "returns and proposed amended returns containing the factual basis upon which it is detaining Petitioner.").  Here, by contrast, the factual basis for the extradition request and the Treaty provisions on which the request for extradition is based have been provided for the court's thorough scrutiny.  Further, Rivera has been represented by counsel throughout these proceedings, has had an extradition hearing before a neutral

29

magistrate judge, and has had the opportunity to present legal authorities and arguments in support of his positions in fulsome briefing.

### e.  The Treaty Is Not Unconstitutionally Vague

Rivera's final argument in opposing extradition is that the provision of the U.S.-Mexico Treaty permitting extradition of U.S nationals, like Mr. Rivera, "is impermissibly vague under Supreme Court precedent."  (Opp'n at 8, 35.)  First, Rivera contends, the Treaty's provision that allows for the extradition of U.S. violates "the substantive due process right not to be unwilfully transferred by the U.S. government to a foreign nation where they are likely to be tortured, the right to bodily integrity, the right to be free from government detention, and the right to remain in this country."  (*Id*.)  Second, he maintains that the "relevant provision of the U.S.-Mexico treaty is impermissibly vague" because it permits the executive to "extradite an American if '*it be deemed proper to do so*' without further elaboration or guidance[.]"  (*Id*. (emphasis added))  Neither argument defeats certification.

First, the void for vagueness doctrine is most commonly applied in criminal cases and is not applicable here because extradition proceedings are not criminal.  *In re Extradition of Kirby*, 106 F.3d 855, 867 (9th Cir. 1996); *and see Martinez Santoyo v. Boyden*, 130 F.4th 784, 787 (9th Cir. 2025) ("Because extradition is a diplomatic process, the judiciary's role in extradition proceedings is very narrow.") (internal citation omitted).  The cases that Rivera relies upon to make the "void for vagueness" argument involve neither extradition statutes nor duly implemented diplomatic treaties.  (*See* Opp'n at 35-36.)

*Dimaya* involved a challenge to a residual clause in an immigration statute that made aliens subject to removal for certain prior convictions.  *Sessions v. Dimaya*, 584 U.S. 148, 160 (2018).  In *Johnson*, the Supreme Court found a residual clause in the Armed Career Criminal Act to be unconstitutionally vague.  *Johnson v. U.S.*, 576 U.S. 591, 595 (2015).

30

Justice Scalia, writing for the court in *Johnson*, emphasized that the "[t]he prohibition of vagueness in *criminal* statutes applies . . . not only to statutes defining elements of *crimes*, but also to statutes fixing *sentences*." *Id.* (emphasis added, internal citations omitted). Finally, in *Kolender*, the Supreme Court concluded that a state law requiring criminal suspects to provide a "credible and reliable" form of identification was void for vagueness because the statute contained "no standard for determining what a suspect has to do in order to satisfy the requirement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Here, Rivera identifies no authority, published or otherwise, that applies the void for vagueness doctrine in the extradition certification context and certainly none that analyze or even discuss the U.S.-Mexico Treaty at issue here. (*See* Opp'n at 35-36.) This Court could find none either.

Second, Rivera contends that the Federal extradition statute fails to provide sufficient guidance on "when it is 'proper' for the executive to exercise the extradition power." (Opp'n at 36.) According to Rivera, the Treaty outlines "an indeterminate and arbitrary standard for exercising the extradition power." (*Id.*) But here, too, Rivera ignores the limited nature of this *certification* proceeding. As emphasized above, and reiterated in legions of cases, the Secretary of State, not this Court, makes the ultimate extradition decision. To the extent Rivera challenges a potential executive action under the Treaty, that issue is not ripe in this proceeding.

\\
\\
\\
\\
\\
\\
\\
\\

31

**ORDERS AND CERTIFICATION**

Based on the above findings, and pursuant to 18 U.S.C. section 3184, this Court certifies that it has found Bryant Rivera extraditable to Mexico with respect to the charges pending against him in Mexico.

A warrant may issue for the surrender of Bryant Rivera upon the requisition judge of the proper authorities of the Government of Mexico, according to the terms of the Treaty.

IT IS FURTHER ORDERED that Bryant Rivera shall remain committed to the custody of the United States Marshal, to be confined without bail until he is surrendered to the Government of Mexico pursuant to the applicable provisions of the Treaty.

IT IS FURTHER ORDERED that the attorney for the United States forthwith shall obtain transcripts of all proceedings before this Court and deliver those transcripts to the Clerk of the Court.  The Clerk of the Court shall forward to the Secretary of State a copy of this Order, together with the transcripts and copies of documents on file herein.  The Clerk of the Court also shall file herein a copy of the transcripts of all proceedings before this Court.

IT IS SO ORDERED.

DATED: April 10, 2025

KAREN L. STEVENSON
CHIEF UNITED STATES MAGISTRATE JUDGE

32